JOSEPH M. D'IPPOLITO, *ET AL.*, PLAINTIFFS - APPEL-
LANTS, v. JOSEPH N. CASTORO, *ET AL.*, DEFENDANTS-
RESPONDENTS.

JOSEPH N. CASTORO, PLAINTIFF-RESPONDENT, v. JOSEPH
M. D'IPPOLITO, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued April 1, 1968—Decided May 20, 1968.

*Mr. William L. Boyan* argued the cause for appellants.

*Mr. Thomas C. Jamieson, Jr.* argued the cause for respondents (*Messrs. Jamieson, Walsh, McCardell & Moore,* attorneys).

The opinion of the court was delivered by

HANEMAN, J. This appeal requires a determination of the duties and liabilities existing between co-guarantors of a promissory note.

The record discloses that D'Ippolito attempted to establish his own carton manufacturing corporation in 1962. When a credit commitment failed, D'Ippolito sought working capital from other sources. He contacted Castoro, an experienced businessman who, after several meetings, began to advance money to the corporation.

The financial condition of the corporation worsened and it became necessary to obtain loans from the Trenton Trust Company. The loans were secured by notes which were personally endorsed by both Castoro and D'Ippolito. The necessity of endorsing each note periodically became burdensome and on September 20, 1963 a guaranty agreement was signed by Castoro, D'Ippolito and D'Ippolito's wife. The last signature was necessary because D'Ippolito's only asset was a house held by himself and his wife as tenants by the entirety. Castoro, on the other hand, had substantial assets.

The testimony diverges as to the existence and nature of an agreement between Castoro and D'Ippolito as to their liability. The latter testified that they had both discussed their responsibilities and that Castoro felt that since he was the only one with assets he would be responsible but they agreed that "our liability was 50-50. In other words we both had liability". Castoro, on the other hand, testified that there was no agreement as to respective liability except

that D'Ippolito had given assurances that any claim would be satisfied solely by D'Ippolito. The court found that each was to bear a one-half responsibility.

The notes secured by the guaranty agreement fell into default; the corporation became bankrupt; and Trenton Trust secured a default judgment against D'Ippolito, Castoro, and the corporation in the amount of $16,189.89. Apparently under threat of a levy upon his house D'Ippolito agreed with the bank to satisfy the judgment by making an initial payment of $4,000 and twelve monthly installments of $1,000 each. The trial court found that this agreement was consummated not as a voluntary assumption of all payments, but as a means to prevent the sale of D'Ippolito's house.

After $8,000 had been paid, D'Ippolito had exhausted his cash assets and called upon Castoro for help. Castoro, although fully apprised of the impending loss of the D'Ippolito home, refused financial aid even to the extent of payment to the bank of his share of the debt. The bank proceeded to levy upon and sell the D'Ippolito house at a sheriff's sale. Castoro, who had had previous dealings with the bank in an individual capacity, had been kept abreast of developments by the bank's attorney and was present at the sale.

At the sale a bid of $20,000 was made by some unidentified third person but later withdrawn, apparently at the request of the bank's attorney who then advised Castoro to submit a bid of $9,372.30 which represented the amount due to the bank plus costs and interest. Castoro's bid closed the auction. The uncontradicted testimony was that the house had a value of $47,000 of which $22,000 represented D'Ippolito's equity. The remainder represented the unpaid balance of a mortgage and various arrearages.

Having obtained the sheriff's deed, Castoro began an action in the Law Division for eviction. D'Ippolito began an action in the Chancery Division for a reconveyance of the house or alternatively for a money judgment of one-half the amount

paid in satisfaction of the original debt. The two cases were consolidated for trial.

The trial court treated the case as one dealing with a constructive trust. Believing that such a trust cannot be imposed in the absence of fraud or breach of a confidential relationship, the court sought to ascertain whether Castoro's action indicated any such conduct or breach of such a fiduciary relationship. The court concluded that there was no fraud and that any fiduciary relationship which might have existed had ended by the time of the sale. The court also believed that a guarantor owes no duty to his co-guarantor until the latter has paid more than his pro-rata share of the debt. Since the court properly treated Mrs. D'Ippolito's signature as merely a means of making her husband's signature effective as to his sole asset, D'Ippolito would have had to pay more than half the judgment before Castoro would have had any obligation to come forward. Accordingly the court ruled that Castoro was not required to pay any money either to the bank or to D'Ippolito until after the house had been sold and therefore dismissed the suit for a reconveyance and granted a judgment for possession to Castoro. However, the court also concluded that since the proceeds of the sheriff's sale together with D'Ippolito's payments had fully satisfied the debt, and Castoro had made no payment to the bank on account of his obligation as a co-guarantor, D'Ippolito was entitled to contribution from Castoro for $8,686.15 — one-half the money paid to the bank. Additionally, various allowances were made for the payment of interest on the mortgage, taxes and insurance on the one time D'Ippolito home. The Appellate Division affirmed and we granted certification on D'Ippolito's petition. 51 *N. J.* 8 (1967).

██ Although *Gordon v. Griffith,* 113 *N. J. Eq.* 554 (*Ch.* 1933) indicates that fraud is an essential element of a constructive trust, the better view as expressed in our later decisions is that a constructive trust will be impressed in any case where to fail to do so will result in an unjust enrichment. *Clark v. Judge,* 84 *N. J. Super.* 35, 61 (*Ch.* 1964)

*aff'd o. b.* 44 *N. J.* 550 (1965); 5 *Bogert, Law of Trusts* § 472, *p.* 10 (*2d ed.* 1965); *Scott on Trusts* § 462.1, *p.* 3417 (*3d ed.* 1967). Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property. *Cf. Neiman v. Hurff,* 11 *N. J.* 55 (1952). *Scott on Trusts, supra,* § 462.2, *p.* 3417, goes so far as to suggest that "A constructive trust may arise, however, even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." We need not here decide, however, whether a constructive trust may arise absent any wrongdoing on the part of the alleged constructive trustee, for Castoro in failing to offer and pay one-half the debt to the principal creditor breached an obligation imposed upon him by the guaranty agreement and thus committed a wrongful act.

■ Castoro's argument is that he breached no duty because the law is well settled that a guarantor is under no obligation to *contribute* by payment to his co-guarantor any portion of a debt until the latter has paid more than his pro-rata share. This is a correct statement of the law. *Vliet v. Wyckoff,* 42 *N. J. Eq.* 642, 643 (*E. & A.* 1887); *Sanderson v. Cicero State Bank,* 125 *N. J. Eq.* 450, 453 (*Ch.* 1939); see cases collected in Note, 45 *Cornell L. Q.* 831, 832, *fn.* 3 (1960); *Restatement, Suretyship* § 150 (1941); *Stearns, Law of Suretyship* § 11.18 (*5th ed.* 1951).

■ However, because such a rule, requiring payment by one co-guarantor of more than his proportionate share of the obligation before having recourse to his co-guarantors for their proportionate share, could impose a self-evident inconvenience, risk, and inequitable hardship upon the paying guarantor, the courts have placed a duty upon each co-guarantor to *exonerate* his fellow co-guarantors by paying his proportionate share of the joint obligation to the principal

creditor. This duty arises upon the maturity of the guaranteed debt and before any payment has been made by any guarantor.

The obligation to come forward does not arise only on a demand by the co-guarantor. The nature of the relationship of co-guarantors is such that an obligation to come forward arises at the time that notice is had that there has been a default in the payment by the principal debtor of the guaranteed debt. In the enforcement of this right at the instance of a co-guarantor, however, the courts ordinarily require the person seeking to enforce that duty to discharge his duty by paying his proportionate share either first or simultaneously with the payment by the others. Thus all co-guarantors have a duty to each other to make payment of their just proportion of the debt.

This duty was first recognized in the old English case of *Wolmershausen v. Gullick* [1893] 2 *Ch.* 514, 519, 62 *L. J.* (*N. S.*) 773, 775 and has been uniformly accepted in this country:

"In effect, under the fair and sensible rule of the Wolmershausen case, (a) a court may decree specific performance of a matured joint principal obligation simultaneously by all the cosureties, who are bound equally to that joint obligation, and (b) that specific performance may be fairly conditioned upon performance by the plaintiff of his share of the joint obligation. The plaintiff thus is not put to the expense and risk of paying the whole joint obligation and seeking reimbursement, possibly at some hardship in financing the payment and because of the costs, inconvenience, and hazards of litigation. Instead, a court of equity enables him to pay, when it is due, no more than his own share of the joint principal obligation and the attendant expenses, at the same time forcing the others equally liable to pay their fair share, which eventually they could be required, at law or in equity, to reimburse to the plaintiff (once he has paid more than his share) by way of eqquitable contribution." *Nissenberg v. Felleman,* 339 *Mass.* 717, 162 *N. E.* 2d 304 (1959).

*Stearns* expresses the rationale for the rule allowing exoneration in terms of hardship:

"Although it is the general rule that a surety must first make payment of the principal's debt before he can call upon his co-sureties

for contribution, in certain situations equity gives a surety the right to call upon his co-sureties for exoneration before any payment is made. For example, if one of several co-obligors is called upon to pay the entire debt, a compliance with this demand might cause financial disaster to him, which his right of contribution after payment would not prevent." *Stearns, supra*, § 11.26.

See also *Chaffee and Simpson, Cases on Equity*, 326*n*; *Ames, Cases on Suretyship*, 597, 598*nn; Restatement, Security* § 156 (1941); 4 *Corbin on Contracts* § 924, *p.* 628–9 (1963); 50 *Am. Jur., Suretyship*, § 301.

■■ Another rationale for the application of the doctrine of exoneration that has been suggested is derived from the two accepted principles that a "guarantor" as between himself and his co-guarantors is a principal debtor for the portion of the debt which he ought to pay and a surety for the remainder, *Bristol Bank & Trust Co. v. Broderick*, 122 *Conn.* 310, 189 *A.* 455 (1939); *Newburger v. Lubell*, 266 *N. Y.* 4, 193 *N. E.* 440 (1934); 4 *Corbin on Contracts, supra,* § 924; 10 *Williston on Contracts*, § 1263, *p.* 839 (*3d ed.* 1967)—and that a surety has the right to require his principal debtor to exonerate him, *Salitan v. Magnus*, 28 *N. J.* 20 (1958); *Atlantic Seaboard Co. v. Borough of Seaside Park*, 36 *N. J. Super.* 142 (*App. Div.* 1955), *certif. den.* 19 *N. J.* 619 (1955); *Keer v. New Jersey Title Guarantee & Trust Co.*, 115 *N. J. Eq.* 388 (*Ch.* 1934); *Williston, supra,* § 1264. Under this rationale, D'Ippolito, having paid the portion as to which he was principal debtor had the right to call upon Castoro to pay the share as to which Castoro was the principal debtor.

On either theory, it is clear that D'Ippolito could have required Castoro, by a judgment, to pay one-half the obligation due the bank. But such a judgment would not have *created* any obligation upon Castoro to come forward as indicated; it would only have declared and enforced a pre-existing obligation. *West Jersey Title and Guaranty Co. v. Industrial Trust Co.*, 27 *N. J.* 144, 150 (1958).

It is undisputed here that Castoro had notice that the guaranteed debt was not paid at maturity and knew D'Ippolito would lose his home in which he had an equity of some $25,000 in order to satisfy the balance of the debt of approximately $8,000 unless he, Castoro, came forward with his proportionate share of the debt. Castoro's purchase of the house is not pertinent to a decision of the rights between these parties as he had the obligation to pay his share of the debt regardless of the judicial sale. His conduct merely aggravates the situation. Castoro's breach of his duty to pay his proportionate share was a wrongful act. Had he complied with this duty to pay there would have been no sheriff's sale and he could not have recouped his loss at the expense of D'Ippolito. He cannot so benefit from his illegal conduct. We therefore conclude that he holds title as a constructive trustee for D'Ippolito.

Because title became vested in and remains in Castoro, no rights of third parties have intervened and since the D'Ippolitos have retained possession, it is an easy matter to place the parties in the situations they would have occupied had Castoro fulfilled his obligation prior to the sale. This can be done by ordering a reconveyance of the property to D'Ippolito after an accounting for the carrying charges paid by Castoro on the house and repayment thereof by D'Ippolito. Of course on this disposition Castoro's bid at the sheriff's sale is to be treated as a direct payment to the bank which payment represents his half of the judgment and D'Ippolito is therefore not entitled to any contribution. Whatever Castoro paid at the sale above the one-half of the original debt and interest that D'Ippolito paid represents costs and interest necessitated by Castoro's refusal to bear his share of the debt in the first instance and is therefore not to be charged in any way against D'Ippolito.

Reversed for proceedings consistent with the foregoing and remanded for an accounting.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.