818 A.2d 1275

LAWRENCE FLANIGAN AND ANNE FLANIGAN, CUSTODIANS FOR JOHN E. TITUS, III AND STACY A. TITUS, PLAINTIFFS–RESPONDENTS, v. CRAIG MUNSON, DEFENDANT–APPELLANT.

Argued February 3, 2003—Decided April 3, 2003.

598

*Joseph C. Nuzzo,* argued the cause for appellant.

*Stephen E. Samnick,* argued the cause for respondents.

The opinion of the Court was delivered by

VERNIERO, J.

This case involves a property settlement agreement under which a former wife and husband agreed to name their "children as the irrevocable beneficiaries (until emancipation) on any life insurance policies either of them avail[ed] themselves of through employment." Subsequent to that agreement, the former wife obtained two insurance policies through her employer, but she listed no beneficiaries. In the wake of that party's death, the issue before us is whether the Appellate Division properly imposed a constructive trust on the insurance proceeds in favor of the decedent's children. We hold that a constructive trust is the appropriate remedy in those circumstances.

## I.

Our summary of the underlying facts is derived largely from the parties' certifications and from their testimony before the trial court. Except when indicated, the parties do not dispute those facts. Lori Flanigan, now deceased, was born with hypotrophic cardiomyopathy, a genetic heart condition that thickens the walls of the heart and obstructs blood flow. In 1980, Flanigan married John E. Titus, Jr. The couple had two children, John E. Titus, III, and Stacy A. Titus, born respectively May 4, 1982, and July 5, 1984. Stacy was born with the same heart condition as her mother.

The couple divorced in January 1989. The divorce judgment includes a property settlement agreement that contains a provision regarding life insurance for the benefit of John III and Stacy. The provision states that "[t]he parties warrant and agree that each will name the children as the irrevocable beneficiaries (until emancipation) on any life insurance policies either of them avail themselves of through employment." The agreement also provides that it "shall be binding upon [the parties'] respective heirs, next of kin, executors and administrators."

In September 1989, Flanigan began work at Exxon Company, U.S.A. As a benefit of employment, Exxon provided Flanigan with a life insurance policy in the amount of $34,000 representing her annual salary. Flanigan did not designate a beneficiary for that policy.

Five years later, in December 1994, Flanigan married Craig Munson (defendant). The couple purchased a home in Rockaway, Morris County. About four months into the marriage, Flanigan purchased a contributory life insurance policy through Exxon's employee-benefits program. The employer withheld money from Flanigan's paychecks to finance the premiums for the additional coverage. The parties do not dispute that, given her heart condition, Flanigan would have been unable financially to obtain such insurance without taking advantage of Exxon's program.

The additional coverage amounted to $183,600. Flanigan named no beneficiary on the policy.

According to defendant, the couple decided to purchase the contributory policy because they had planned to renovate their home and purchase a new car. He explained that they had wanted additional coverage as protection to cover a possible second home mortgage or other indebtedness incurred to finance the intended purchases.

Due to complications of her heart ailment, Flanigan became critically ill and fell into a coma. That regrettable circumstance apparently prompted family members to contemplate Flanigan's death. Defendant expressed concern to Flanigan's sister, Lisa Salberg, that in the event of Flanigan's passing, his wages would be insufficient to pay his home mortgage and to meet other expenses. Salberg assured defendant that she and her family would assist financially because they did not want him to lose the house. Later sold by defendant, the house is located in close proximity to Flanigan's parents, Lawrence and Anne Flanigan, the grandparents of John III and Stacy (grandparents).

At about the same time, Salberg consulted an attorney regarding custody arrangements for her sister's children. (Salberg could not recall the exact date of her initial consultation but believed that it might have been before her sister's death.) Flanigan died on June 16, 1995. The grandparents then initiated a custody action against Titus, the children's father. Those parties ultimately entered into a consent judgment awarding joint legal custody to the grandparents and to Titus, and awarding residential custody to the grandparents only. We cannot discern from the record whether the children, now over eighteen years of age, continue to reside with their grandparents.

Anne Flanigan stated that her daughter was "deeply concerned" that if she died, the children would be left without financial resources. The Flanigans (the grandparents and Salberg) were of the view that Titus was not a financially responsible person. Anne Flanigan contended that Titus was in arrears in his child support,

owed more than $2,000 in medical expenses incurred for the children, and had no steady job. She also indicated that she was aware of Stacy's own medical condition. The Flanigans testified that Lori Flanigan had told them that she believed that her former husband would not continue child support payments in the event she passed away.

Because Flanigan had not named a beneficiary in either life insurance policy, Exxon distributed the policies' proceeds to defendant. Specifically, defendant was paid $217,600 (representing $34,000 from the employer-provided insurance, in addition to $183,600 from the employee-purchased policy), plus interest. When defendant received that sum, John III and Stacy were ages 13 and 11 respectively.

Defendant qualified as administrator of Flanigan's estate shortly after his wife's death. Salberg then visited defendant's home. After discovering the divorce judgment and property settlement agreement among Flanigan's papers, Salberg and defendant reviewed the life insurance provision concerning the children. The record does not indicate whether defendant found the property settlement agreement before or after he had received the insurance proceeds. It does, however, indicate that defendant expended some of the proceeds, as more fully described below, after he had read the agreement.

According to Salberg, defendant agreed orally that he would extinguish his home mortgage, satisfy other debts, and then turn over the balance of the insurance proceeds to John III and Stacy. She testified that defendant acknowledged that all of the proceeds belonged to the children and that he promised to reimburse them the full amount when he sold the house or when they were ready to enter college. Defendant denies that he had made that commitment. Instead, he contends that Flanigan's property settlement agreement with her first husband covered only the smaller employer-provided policy. In any event, after receiving the proceeds of both policies, defendant paid off his home mortgage (which cost

about $84,000) and paid other expenses, leaving him an approximate balance of $111,000.

The parties agreed that that sum should be held in trust for the children. (There is some uncertainty regarding the precise amount. As indicated below, one document states that defendant relinquished $108,952.68. Salberg, however, recalled that defendant had turned over the larger $111,000 figure.) They asked the attorney who had represented the grandparents in their custody dispute with Titus to prepare a trust fund agreement. Defendant attended at least one meeting with Salberg at the attorney's office for that purpose.

The parties signed the trust agreement in August 1995. Defendant is the named trustor under the agreement, and Salberg and her mother, Anne Flanigan, are named trustees. The trust agreement's preamble refers to the prior property settlement agreement. Specifically, it describes that earlier agreement's insurance provision as applying only to "employer provided" insurance. The trust agreement also provides:

> The Administrator, hereinafter referred to as the "Trustor", does hereby transfer to the Trustees, the sum of $108,952.68 dollars representing the net proceeds of Life Insurance policy as provided to Lori Munson, pursuant to her employment with Exxon, Inc. *And Funds Gifted by "Trustor"*. All documentation respecting the proceeds as received from Exxon with regard to the proceeds as herein above described, is annexed hereto and made a part hereof, the receipt of which is hereby expressly acknowledged by the Trustees. Trustor releases to the Trustees all rights in the proceeds of said insurance, described in Exhibit A. Such insurance in Exhibit A, shall constitute the Trust Estate and shall be held, managed and administered and distributed by the Trustees as provided in this Agreement.
>
> . . . .
>
> By the execution of this document the Trustor irrevocably transfers to the Trustees, the *net* insurance proceeds as received by virtue of the death of Lori Munson on June 16, 1995 from her employer, Exxon, Inc. By so doing, the Administrator, Craig Munson be and is hereby discharged, from all further responsibilities with regard to said Trust funds, and has transferred all accountability, together with all rights, privileges and duties, to the Trustees, Lisa Salberg or Anne Flanigan.

[(Emphasis added).]

The italicized language, "And Funds Gifted By 'Trustor,'" had been inserted just prior to the parties' execution of the agreement. According to defendant, that language reflects an understanding

among the parties that all sums placed in the trust in excess of the $34,000 employer-provided insurance policy had been a gift from defendant to Flanigan's children. According to Salberg, defendant had asked for that insertion. She also testified that she had considered those words "extremely odd" because "they were not in his normal vocabulary."

The parties made other revisions to the trust document immediately prior to signing it. For instance, the pre-signature version referred to "full insurance proceeds" rather than to "net insurance proceeds," which appears in the existing text. Salberg testified that defendant again had been the party to request that "full" be deleted and replaced by "net."

In April 1996, Salberg discovered that defendant had listed his house for sale. Salberg reminded defendant of his purported oral agreement to forward the balance of monies owed to the children (that balance being the difference between the combined insurance proceeds and the amount defendant turned over to the trustees when he signed the trust agreement). Defendant declined. According to Salberg, defendant responded that "it doesn't matter, it's mine. I can do what I want."

In response to defendant's refusals, the grandparents commenced this litigation in October 1996 as legal custodians for John III and Stacy. Their complaint seeks, among other things, an accounting of the insurance proceeds, a "resulting Trust" on all monies held by defendant, and "[s]uch other relief as the Court may deem equitable and just."

The trial court conducted a bench trial in December 2000. The court found in favor of defendant, concluding that the trust agreement had relieved him of any obligations other than those expressly set forth in that agreement. The court rejected the grandparents' argument that under the property settlement agreement the children are the only beneficiaries of the insurance proceeds. The court also rejected their contention that the rights established under that agreement supersede any limitations found in the subsequent trust agreement.

With one member of the panel dissenting, the Appellate Division reversed in an unreported opinion. The court held that the children's asserted right to the insurance proceeds is "paramount" to any contrary claim of defendant. Accordingly, it remanded the matter to the trial court to determine the extent to which the proceeds could be "traced" for purposes of imposing a constructive trust in favor of John III and Stacy. Defendant appealed to this Court as of right. *R.* 2:2–1(a)(2). We now affirm.

## II.

We first examine the property settlement agreement between Flanigan and her first husband, Titus. Courts recognize property settlement agreements as "fall[ing] within the category of contracts enforceable in equity." *Petersen v. Petersen,* 85 *N.J.* 638, 642, 428 *A.*2d 1301 (1981). Consistent with familiar canons of construction, the words of an agreement are given their "ordinary" meaning. *Shadow Lake Vill. Condo. Ass'n v. Zampella,* 238 *N.J.Super.* 132, 139, 569 *A.*2d 288 (App.Div.1990). "In interpreting a contract, [i]t is not the real intent but the intent expressed or apparent in the writing that controls." *Garfinkel v. Morristown Obstetrics and Gynecology Assocs.,* 168 *N.J.* 124, 135, 773 *A.*2d 665 (2001) (internal citations and quotation marks omitted) (alteration in original).

The law also is well settled that children of a marriage are third-party beneficiaries of a settlement agreement between their parents. *In re Estate of Lingle,* 72 *N.J.* 87, 95, 367 *A.*2d 878 (1976); *Sodora v. Sodora,* 338 *N.J.Super.* 308, 312, 768 *A.*2d 840 (Ch.Div.2000). In that regard, a court in a matrimonial matter is authorized to direct parents to maintain life insurance naming their minor children as beneficiaries to secure the parents' continued support obligations. *Grotsky v. Grotsky,* 58 *N.J.* 354, 361, 277 *A.*2d 535 (1971); *see also N.J.S.A.* 2A:34–23 (authorizing courts in matrimonial actions to order parties to provide for education and maintenance of children and to create "trusts or other security devices" for that purpose).

Based on the foregoing principles, we have no doubt that John III and Stacy are beneficiaries of the property settlement agreement between their biological parents. As such, they have standing to enforce that agreement, including its insurance provision. *In re Estate of Lingle, supra*, 72 *N.J.* at 95, 367 *A.*2d 878.

As for the provision itself, the parties do not dispute that the smaller employer-provided policy falls within its purview. We also conclude that the provision's mandate to Flanigan and Titus to designate their children as beneficiaries "on any life insurance policies either of them avail themselves of through employment" encompasses the larger employee-purchased policy. We rely on an everyday, common-sense construction of those terms. In so doing, the Court is satisfied that Flanigan "avail[ed]" herself of insurance "through her employment" when she purchased the additional policy via payroll deductions, all pursuant to Exxon's employee-benefits program.

We also rely on the fact that the agreement uses "any" to describe the contemplated insurance policies. That description fortifies our conclusion that Flanigan was obligated to name her children as irrevocable beneficiaries on both the employer-provided and employee-purchased policies. That Flanigan might have purchased the additional policy as protection against future indebtedness cannot defeat the agreement's broad language. See *Kotkin v. Aronson*, 175 *N.J.* 453, 815 *A.*2d 962 (2003) (enforcing contractual terms as broadly written by drafter). The Appellate Division stated, and we agree, that once that language was incorporated in her divorce judgment, Flanigan could not have modified it unilaterally without applying to the trial court. *N.J.S.A.* 2A:34-23. Absent that application, the agreement's existing terms govern.

## III.

The remaining issue is whether this Court should enforce the property settlement agreement by imposing a constructive trust in

the children's favor as sought by the complaint. Generally, courts are authorized to impose a constructive trust "wherever specific restitution in equity is appropriate on the facts." Dan B. Dobbs, *Remedies* § 4.3, at 246 (1973). Such a trust is designed to "prevent unjust enrichment and force a restitution to the plaintiff of something that in equity and good conscience [does] not belong to the defendant." *Id.* at 241.

Stated differently, "[a] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.,* 225 *N.Y.* 380, 122 *N.E.* 378, 386 (1919) (Cardozo, J.). "If the property has been sold the trust attaches to its proceeds in the hands of the defendant, or to other property purchased by defendant into which the original property or its proceeds can be traced." George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 471, at 4–5 (2d ed.1978) (footnotes omitted).

■  Against that backdrop, our courts employ a two-prong test when determining whether a constructive trust is warranted in a given case. First, a court must find that a party has committed "a wrongful act." *D'Ippolito v. Castoro,* 51 *N.J.* 584, 589, 242 *A.*2d 617 (1968). The act, however, need not be fraudulent to result in a constructive trust; a mere mistake is sufficient for these purposes. Dobbs, *supra,* § 4.3, at 243 (observing that "constructive trust may be used as a remedy for innocent misstatements, or even simple mistakes, as well as a remedy for fraud"). Second, the wrongful act must result in a transfer or diversion of property that unjustly enriches the recipient. *Castoro, supra,* 51 *N.J.* at 589, 242 *A.*2d 617.

■  Flanigan's failure to name her children as beneficiaries on the two policies was a wrongful act. Flanigan's mother, Anne, suggested in her testimony that Flanigan's omission was inadvertent. She noted that her daughter's conduct was "typical" of her

behavior in that Flanigan often procrastinated and "[t]ook on too much." That might be so, and we do not suggest a more nefarious motive on Flanigan's part. As just stated, however, "innocent misstatements, or even simple mistakes" can qualify as a wrongful act in these circumstances. Dobbs, *supra*, § 4.3, at 243. Flanigan's breach of the property settlement agreement wrongfully deprived her children of the insurance proceeds, satisfying the first prong of the test for equitable relief.

The subsequent trust agreement signed by defendant includes language purportedly limiting his obligations to the "net" insurance proceeds. The Appellate Division observed correctly that the parties' execution of that agreement itself constituted a "wrongful diversion of the life insurance proceeds." We are not persuaded by defendant's argument that the trust agreement's reference to "employer provided" life insurance is relevant to how we interpret the insurance provision in the earlier property settlement agreement. Because neither party to the settlement agreement signed the trust agreement, the two agreements are not linked in the manner suggested by defendant. Put simply, the trust agreement cannot trump or curtail the unambiguous language of the earlier property settlement agreement.

In respect of the second prong, we are satisfied that defendant has been enriched unjustly by his receipt of the insurance proceeds. The policies did not list defendant as beneficiary. Instead, by operation of the property settlement agreement as incorporated in the divorce judgment, the proceeds had been earmarked exclusively for John III and Stacy once their mother obtained the two policies through her employer. We acknowledge, as did the appellate court below, that the payroll deductions used to fund the premiums for the second policy reduced Flanigan's and defendant's joint household income. That circumstance, however, is insufficient to vest defendant with an interest in the insurance proceeds superior to that of the children.

In other words, we reject the notion that the facts surrounding the purchase of the second policy transformed defendant into a

bona fide purchaser for value for purposes of defeating a construc-
tive trust. See Bogert & Bogert, *supra*, § 471, at 5–7 (providing
brief overview of contours to trust remedy). In that respect, we
cannot improve on the analysis of the Appellate Division:

> We do not consider that the two months of payroll withholding from [Flanigan's]
> salary, which reduced [Flanigan's] and defendant's joint income for that period,
> under the circumstances of this case, are sufficient to convert defendant's status to
> that of a bona fide purchaser for value of the insurance proceeds. The purpose for
> which the group life insurance was purchased, stated most favorably to defendant,
> is derived from his own testimony: "[W]e were discussing adding onto the house
> and purchasing a car.... What we had was too small and because of her health,
> you know, we wanted additional insurance to cover any kind of mortgage or
> expenses, loans, that we were going to take out." Before they ever incurred any
> such indebtedness, however, [Flanigan] died. As such, this asserted purpose did
> not materialize and could not provide consideration to render defendant a purchas-
> er for value.

Our disposition is consistent with the approach taken in *Hirsch
v. Travelers Ins. Co.*, 134 *N.J.Super.* 466, 341 *A.2d* 691 (App.Div.
1975). In that case, a divorce decree required a father to name
his children as irrevocable beneficiaries of seven life insurance
policies, but instead he named his second wife as beneficiary on
some of the policies. *Id.* at 468–69, 341 *A.2d* 691 & n. 1. After the
father's death, the Appellate Division concluded that the children
"were beneficiaries of the insurance policies ... and had an
equitable interest in the ... proceeds of the insurance policies."
*Id.* at 471, 341 *A.2d* 691. The court held that the children had
stated a cause of action against the second wife and that a
constructive trust was an available remedy. *Ibid.*

Our holding resembles similar rulings by the highest courts in
other jurisdictions. *See, e.g., Aetna Life Ins. Co. v. Hussey*, 63
*Ohio St.*3d 640, 590 *N.E.*2d 724, 727 (1992) (stating "where a
separation agreement embodied in a divorce decree mandates
insurance coverage and unambiguously designates a purpose for
which insurance proceeds are to be used by certain beneficiaries,
a constructive trust for that designated purpose is the appropriate
remedy"); *McKissick v. McKissick*, 93 *Nev.* 139, 560 *P.*2d 1366,
1368–69 (1977) (concluding provision in settlement agreement re-
quiring husband to obtain and maintain life insurance for benefit

of former wife justified imposition of constructive trust on assets of second wife when husband wrongfully named second wife as beneficiary).

Subject to these brief instructions, we leave it to the trial court on remand to implement a constructive trust consistent with this opinion. The court shall provide the parties an opportunity to argue the precise parameters of relief. Defendant, for example, apparently used some of the insurance proceeds to pay Flanigan's funeral expenses. We assume that the court will conclude that defendant was not enriched unjustly by that expenditure or that it benefited the children by bringing closure to their family's grief. Indeed, counsel for the grandparents indicated at oral argument before this Court that his clients do not seek reimbursement for those costs. Conversely, we share the Appellate Division's belief that defendant's payoff of his home mortgage inured solely to his benefit and thus defendant is entitled to no "credit" for that expenditure.

Lastly, we caution courts generally that a constructive trust is a powerful tool to be used only when the equities of a given case clearly warrant it. This is such a case. The property settlement agreement between Flanigan and her first husband unambiguously establishes John III's and Stacy's right to the proceeds at issue here. That agreement's explicit provision stating that it shall bind Flanigan's "heirs, next of kin, executors and administrators" buttresses our holding. A constructive trust in favor of John III and Stacy is in accord with New Jersey's long-standing policy, as reflected in *N.J.S.A.* 2A:34–23, of providing for the care and financial security of children in these circumstances. In view of all facts, it is the appropriate remedy.

## IV.

To the extent that we have not specifically addressed issues or arguments advanced by defendant we deem them to be without sufficient merit to warrant discussion. *R.* 2:11–3(e)(1)(E). The judgment of the Appellate Division is affirmed and the matter is

remanded to the trial court for further proceedings.  We do not retain jurisdiction.

*For affirming and remanding*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.