901 A.2d 428 (2006)
386 N.J. Super. 359
Tracy M. THOMPSON,[1] Acting Director, Office of Government Integrity, Plaintiff-Appellant/Cross-Respondent,
v.
CITY OF ATLANTIC CITY, Lorenzo Langford, and William Marsh, Defendants-Respondents/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Telephonically Argued June 1, 2006.
Decided June 28, 2006.
*430 Ronald B. Epstein, Deputy Attorney General, argued for the cause for appellant (Tracy M. Thompson, Acting Director, Office of Government Integrity, attorneys; Mr. Epstein, of counsel and on the brief).
Stephen G. Raymond argued the cause for respondents/cross-appellants Langford and Marsh (Raymond & Coleman, attorneys; Mr. Raymond, of counsel and on the brief).
Jay H. Greenblatt argued the cause for respondent City of Atlantic City (Greenblatt & Laube, attorneys).
Before Judges C.S. FISHER, YANNOTTI and MINIMAN.
The opinion of the court was delivered by
FISHER, J.A.D.
The trial judge in this matter correctly invalidated an agreement to settle a federal lawsuit, which was entered into by the governing body of Atlantic City, because it resulted from a process infected by numerous conflicts of interest. The settlement was reached after one of the two plaintiffs in the federal suit, Lorenzo Langford, had been elected and sworn in as the City's mayor; the other plaintiff, William Marsh, was named to fill a vacancy on the City Council immediately after the settlement was approved and funded. Despite the invalidity of the City's agreement to settle Langford and Marsh's federal suit against the City and its then mayor and council, the judge concluded that no remedy was available to the Office of Government Integrity (OGI), the plaintiff in the suit at hand, because the judge believed any remedy would interfere with or override a federal order which dismissed the settled federal suit. Because *431 there is no reason to conclude that the federal judge intended to retain jurisdiction over this particular post-settlement controversy, and because equity is sufficiently flexible to devise an appropriate remedy without impacting upon the federal court's processes, we reverse the judge's order denying relief and remand for further proceedings in conformity with this opinion.

I
The issues presented in this action have their genesis in the termination of the positions held by Langford and Marsh with the Atlantic City Board of Education. Langford and Marsh believed they lost these jobs in 1998 because of their political activities and their opposition to Mayor James Whelan and members of the City Council. Langford had run against Whelan in the 1998 mayoral election and lost; Marsh, a long-time Langford ally, was Langford's campaign treasurer during the 1998 election.
Upon the termination of their positions with the board of education, Langford and Marsh consulted with Charles Ercole, Esq., who recommended that they seek the advice of Sidney Gold, Esq. Gold's law firm commenced a civil rights suit on behalf of Langford and Marsh in the United States District Court for the District of New Jersey in 1999, seeking damages against Atlantic City and Whelan, as well as Timothy Mancuso, Barbara Hudgins, John Schultz, Edward McGettigan, Gibb R. Jones, and Michael Zingarelli, who were then members of the City Council.
The federal action was still pending[2] when Langford was elected mayor in the November 2001 election. On November 28, 2001, prior to Langford's taking office, the City Council went into executive session to discuss the federal lawsuit.[3] During that session, the city solicitor advised the Council that Langford and Marsh were "very interested" in settling and that she would provide further advice following a conference with the federal district judge.
On December 12, 2001, the Council again went into executive session. In this second session, the city solicitor advised that, during the conference with the district judge, Langford and Marsh had collectively demanded $1,000,000, while the district judge suggested that the City negotiate toward a nominal settlement. The city solicitor advised the Council that she thought "$150,000 would be more than a nominal settlement and a good faith offer to settle," and also suggested $300,000 might ultimately settle the case, although she did not think this would be acceptable to Langford and Marsh. The city solicitor indicated that the district judge was concerned about the impact of Langford's election as mayor and, as a result, he would thereafter become "very involved," would possibly appoint separate counsel for the City, or possibly put the case "on hold for four years." Despite the heightened interest in settling the suit before Langford took office, no resolution was reached.
Langford was sworn in as mayor on January 2, 2002. On that same day, Langford appointed Benjamin Fitzgerald as the *432 City's business administrator. By executive order issued by Langford on January 18, 2002, Fitzgerald was designated as "Acting Mayor" in Langford's absence.
On January 16, 2002, the Council adopted a resolution authorizing Langford, as mayor, to execute a contract for the purchase of legal services from Ercole, who had served as Langford's co-campaign finance chair during the 2001 race. Ercole had also consulted with Langford and Marsh regarding their claims against the City prior to the commencement of the federal suit by another attorney. Ercole entered into a legal services agreement with the City on January 25, 2002.
On January 30, 2002, the Council went into a closed session to discuss the federal suit. Langford stepped aside, as he had during the prior months when he was a member of the Council. With the considerable involvement and influence of Fitzgerald (the business administrator who was acting as mayor pursuant to Langford's executive order), Ernest D. Coursey (the president of the City Council, who resigned that position to become Langford's confidential aide the next day), and Ercole (the attorney retained to render services for the City at the mayor's direction, who had also advised Langford and Marsh prior to the commencement of their federal suit), the acting mayor and the Council decided to enter into an agreement to settle the federal suit for $850,000.[4]
The federal district judge was advised of the settlement on January 31, 2002. An order dismissing the action was entered the same day.
On February 27, 2002, the Council introduced and adopted a resolution to fund the settlement. About this time, the OGI learned of these events and advised Ercole that the legitimacy of the settlement was being investigated. The OGI requested that the settlement funds be held in escrow pending the completion of its investigation. The parties refused to accede to the OGI's requests and the settlement funds were immediately released to Langford and Marsh.
The OGI filed a complaint in the Law Division seeking, among other things, the imposition of a constructive trust on the settlement funds. There being no material factual disputes, the judge held by way of summary judgment that the settlement agreement violated the Faulkner Act, N.J.S.A. 40:69A-1 to -210, and was the product of numerous intolerable conflicts of interest. The judge, however, held that any remedy would have the effect of overriding the January 31, 2002 order of dismissal entered in the federal district court and, thus, the trial judge concluded that no relief could be granted.
The OGI appealed, contending that the trial judge mistakenly failed to either order restitution of the settlement funds or grant other legal or equitable relief that might redress the consequences of the inappropriate settlement. Langford and Marsh cross-appealed, arguing that the trial judge erroneously declared the settlement agreement to be invalid. We affirm that part of the final judgment which declared the settlement agreement to be invalid, but we reverse that part which denied relief and remand for further proceedings.

II
Atlantic City adopted the mayor-council form of government defined by the Faulkner *433 Act. N.J.S.A. 40:69A-32(a) provides that such a municipality "shall be governed by an elected council, and an elected mayor," and that "unless the explicit terms and context of the statute require a contrary construction, any administrative or executive functions assigned by general law to the governing body shall be exercised by the mayor, and any legislative and investigative functions assigned by general law to the governing body shall be exercised by council." N.J.S.A. 40:69A-39 assigns to the mayor "the executive power of the municipality." The Faulkner Act specifically directs that the mayor shall, among other things, "supervise, direct and control all departments of the municipal government," "sign all contracts, bonds or other instruments requiring the consent of the municipality," "negotiate contracts for the municipality, subject to council approval," and "assure that all terms and conditions imposed in favor of the municipality or its inhabitants in any statute, franchise or other contract are faithfully kept and performed." N.J.S.A. 40:69A-40(c), (g), (j) and (k). The council in such a form of government, among other things, is empowered to "approv[e] of contracts presented by the mayor," N.J.S.A. 40:69A-36(l), and is required to do so by ordinance.
Our Supreme Court has described the considerable authority of the mayor in a Faulkner Act mayor-council plan of government in the following way:
The mayor's authority under the Faulkner Act's mayor-council plan is, therefore, substantial, and "[i]t is no accident that this plan has been adopted by virtually all of New Jersey's largest municipalities  places in which there is a need for visible, effective leadership to pursue programs with the full support of the administration. It is also no accident that when the Legislature passed the Faulkner Act, it felt compelled to qualify the broad grant of powers to municipalities generally, and to mayors specifically, with a heightened standard of ethical responsibility."
[McCann v. City of Jersey City, 167 N.J. 311, 330-31, 771 A.2d 1123 (2001) (citations omitted).]
Since, as the Court has also emphasized, the Faulkner Act delivers a "clear and unmistakable" mandate charging the mayor "with the duty to negotiate and sign, subject to City Council's approval, contracts that bind the City," City of Newark v. James, 183 N.J. 361, 371-72, 873 A.2d 544 (2005), the quandary presented by the Langford and Marsh suit against the City and any attempt to enter into a contract to settle that suit  while Langford was mayor  was palpable. The considerable authority possessed by the mayor in this type of government, coupled with the concomitant "heightened standard of ethical responsibility," McCann, supra, 167 N.J. at 331, 771 A.2d 1123, raises unique difficulties when a Faulkner Act municipality attempts to settle a mayor's lawsuit against it.
Here, only a superficial attempt was made to avoid the inherent conflicts this circumstance generated. Langford recused himself from the proceedings that resulted in the settlement agreement. His continued direct involvement would have created an obvious and insurmountable conflict of interest. But, because of the nature of the City's form of government, the mayor's indirect influence remained a large factor and required greater effort to distance the mayor, and those he had appointed in various important roles, from the process that generated the settlement agreement than occurred here.
The Faulkner Act places the power of the mayor's office with whichever official is designated by the mayor "to act as mayor *434 whenever the mayor shall be prevented by absence from the municipality, disability or other cause from attending to the duties of his office." N.J.S.A. 40:69A-42. The Faulkner Act declares that this designee, during the time of the mayor's absence or inability to act, "shall possess all the rights, powers, and duties of mayor." Ibid. On January 18, 2002, shortly after taking office, Langford issued an executive order which set forth an order of succession for the exercise of the powers of the mayor in Langford's absence or upon his disability, or inability, to act. This order designated Fitzgerald, the business administrator, as acting mayor in Langford's absence. As observed, Fitzgerald had been appointed by Langford as business administrator; thus, Langford's own appointee was empowered by Langford's executive order to propose and authorize a settlement of Langford's suit against the City. Also involved in the settlement discussions was Ercole, who contracted with Langford to provide legal services to the City; we have already mentioned that Ercole gave advice to Langford and Marsh prior to the commencement of their federal suit. In addition, the Council president, Ernest D. Coursey, also pushed for a settlement of the federal action even though he had indicated, once that process was complete, that he would resign that position to become Langford's confidential aide.
As fully recounted in the trial judge's comprehensive written decision, the very nature of the City's form of government made unlikely, if not impossible, a settlement of the suit brought against the City by its current mayor:
That Mayor Langford could not personally negotiate a financial settlement of the litigation in which he was a plaintiff suing the City, is patently obvious. Likewise, it is equally obvious that Fitzgerald, whether serving as the Acting Mayor or as the Business Administrator could not step into the shoes of Mayor Langford for the purpose of negotiating a settlement on the Mayor's behalf which the Mayor filed against the City where he serves as the elected Chief Executive.
[The OGI] alleges that conflicts abound in this matter, an assertion which is not subject to debate. The conflicts arise as the result of a statutorily defined plan of government which neither contemplates nor provides for a process for a Mayor to settle litigation during his term of office, in which he is the plaintiff suing the City.
We agree.
We also agree that these inherent conflicts were exacerbated by the considerable roles played by persons who either had been or would immediately thereafter be appointed to city positions by Langford. As the trial judge observed, Fitzgerald had been appointed as business administrator by Langford and was acting as mayor in the formulation of the settlement agreement:
Fitzgerald was present at the session "as the highest member of the Executive Branch" to present his "official recommendation." Fitzgerald was appointed by the Mayor and is directly supervised by the Mayor. The fact that Fitzgerald recommended reducing the settlement amount from $1,000,000 to $850,000 is irrelevant. It must be emphasized that the issue in this matter is not whether the $850,000 settlement is reasonable or fair. Rather, the issue is whether the Faulkner Act permits the Acting Mayor to negotiate a financial settlement on behalf of a Mayor and the Mayor's co-plaintiff under a plan of government which by statute requires litigation settlements, *435 i.e., contracts, to be negotiated by the Mayor's Office.
The judge correctly concluded that Fitzgerald's involvement as acting mayor in this setting required the invalidation of the settlement agreement.
In addition, the judge found that Ercole's involvement tainted the proceedings that led to the settlement agreement, and also that the participation of Coursey added to the invalidity of the agreement since "he participated in the consensus vote held during the Executive Session subsequent to [having] given notice of his intention to resign as Council President, to assume the position of Confidential Aide to Mayor Langford."
We agree with the trial judge's determination that these inherent and actual conflicts rendered untenable the settlement agreement in question.[5]
We lastly consider in this regard Marsh's claim that his settlement with the City should not be affected by the conflicts generated by Langford's involvement. We reject this contention for two essential reasons. First, we observe that Marsh was appointed to fill a council vacancy the same day that the Council adopted a resolution authorizing transfer of the settlement funds to him and Langford. This fact alone strongly suggests that Marsh was hardly the innocent bystander caught up in the web of conflicts generated by Langford's election as mayor. Second, the settlement called for a collective sum to be paid to both Langford and Marsh. Regardless of any arguable motives that may have led to settling through payment of a lump sum, the result is that Marsh received a benefit from having his claim settled along with Langford's without any attempt by the acting mayor or the Council to distinguish between the two. The nexus between Langford's and Marsh's claims requires a rejection of Marsh's claim of the validity of that part of the settlement agreement which related to him. Quite simply, in these circumstances, their claims cannot be parsed.

III
Although she correctly concluded that the settlement agreement violated the Faulkner Act and should be declared invalid, the trial judge determined that she was not empowered to "invade the jurisdiction of the federal court by vacating a settlement which resulted in the dismissal of the federal litigation pursuant to an order entered by the United States District Court." We conclude that the judge's denial of a remedy was erroneous, and that (a) the granting of relief would not "invade the jurisdiction of the federal court" because there is no evidence to suggest that the federal judge intended to retain jurisdiction over a dispute such as that raised by the OGI, and (b) the crafting of a remedy  acutely required to remedy a settlement agreement that had not been legally formed  could have been accomplished without the trial court acting inconsistently with the processes of the federal court. Accordingly, we reverse and remand for additional proceedings.

A
The trial judge mistakenly concluded that the granting of relief in state court would interfere with the jurisdiction of the federal court. Upon it being reported to him that the suit had been settled, the federal district judge entered an order *436 which, because of the importance of its content, we quote in its entirety:
It having been reported to the Court that the above-captioned action has been settled, and that the request for an order of dismissal is not based on a desire to adjourn or delay the proceedings herein;
IT IS on this 31st day of January, 2002,
ORDERED THAT:
(1) This action is hereby DISMISSED without cost and without prejudice to the right, upon motion and good cause shown, within 60 days, to reopen this action if the settlement is not consummated; and
(2) If any party shall move to set aside this Order of Dismissal as provided in the first decretal paragraph or pursuant to the provisions of Fed. R.Civ.P. 60(b), in deciding such motion the Court retains jurisdiction of the matter to the extent necessary to enforce the terms and conditions of any settlement entered into between the parties.
In considering the impact of this order upon the action brought by the OGI in state court challenging the validity of the agreement to settle a federal suit, we must first recognize that federal courts are courts of limited jurisdiction, possessing only that power authorized by the federal constitution and acts of Congress. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391, 395 (1994); Willy v. Coastal Corp., 503 U.S. 131, 136-37, 112 S.Ct. 1076, 1080, 117 L.Ed.2d 280, 288 (1992); Bender v. Williamsport Area School Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501, 511 (1986). This jurisdiction cannot be expanded by judicial order. Kokkonen, supra, 511 U.S. at 377, 114 S.Ct. at 1675, 128 L.Ed.2d at 395; see also American Fire & Cas. Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951).
This basic understanding of the limits of federal jurisdiction has generated considerable discussion in the federal courts regarding the scope of a court's authority over post-settlement controversies. To resolve doubts about the limits of federal jurisdiction in that setting, the Supreme Court held that the "[e]nforcement of the settlement agreement . . . whether through award of damages or decree of specific performance, is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." Kokkonen, supra, 511 U.S. at 378, 114 S.Ct. at 1675-76, 128 L.Ed.2d at 396 (emphasis added). In determining whether there exists a federal jurisdictional basis for such a dispute, the Kokkonen Court considered the scope of ancillary jurisdiction, holding that an order which merely dismissed a federal action because of a settlement would not authorize the district court's later assumption of jurisdiction to enforce the settlement agreement or to resolve a controversy regarding the terms or enforceability of the settlement agreement. Id. at 380-81, 114 S.Ct. at 1677, 128 L.Ed.2d at 397-98. Had the order of January 31, 2002 contained only its first decretal paragraph, there would be no doubt that the federal court would not have jurisdiction over a controversy surrounding the settlement agreement, and examination into the validity of the settlement agreement in the trial court would not have been foreclosed either in form or substance. See, e.g., Shaffer v. GTE North, Inc., 284 F.3d 500, 504 (3rd Cir. 2002) (holding that an order containing the same language as the first decretal paragraph of the January 31, 2002 order could not legitimize the exercise of ancillary jurisdiction over disputes about the settlement agreement). Accordingly, it is only *437 the second decretal paragraph of the January 31, 2002 order that gives pause.
In Kokkonen, the Supreme Court indicated that a federal court may validly exercise ancillary jurisdiction over a post-settlement controversy in order to "protect its proceedings and vindicate its authority" if the order itself either contains the terms of the parties' settlement or contains a provision "retaining jurisdiction" over the settlement agreement. Kokkonen, supra, 511 U.S. at 380-81, 114 S.Ct. at 1677, 128 L.Ed.2d at 397-98. Because federal courts are courts of limited jurisdiction and because the exercise of ancillary jurisdiction to resolve post-settlement controversies is itself a slim reed for exercising federal jurisdiction over such a dispute, it suffices to say that an order dismissing a settled case should be narrowly construed. The Court in Kokkonen held that absent a clear retention of jurisdiction in this setting "enforcement of the settlement agreement is for state courts." Id. at 382, 114 S.Ct. at 1677, 128 L.Ed.2d at 398.
In this case, the terms of the settlement agreement were not incorporated within the January 31, 2002 order, but the federal district judge did indicate his retention of jurisdiction to enforce the settlement agreement if either party sought to vacate the order of dismissal. This limited retention of jurisdiction does not encompass the present controversy.
The dispute here is not between the parties to the federal suit, nor does it concern the enforcement of the settlement agreement. Instead, the OGI has questioned the legitimacy of the settlement agreement which terminated the federal suit. There is no reason to believe from an examination of the terms of the January 31, 2002 order that it was the district judge's intention to exercise jurisdiction over the OGI's claim, even assuming such a controversy was within the court's contemplation at the time the order was entered. Moreover, since any attempt to retain jurisdiction in such an order should be narrowly construed, there is nothing about the language utilized which reveals an intent on the part of the federal judge to exert ancillary jurisdiction over the present controversy. Instead, the order stated that jurisdiction would be retained only "[i]f any party shall move to set aside" the order of dismissal. Such an event has never occurred; no party to the federal suit ever moved to set aside the January 31, 2002 order  the only event which would trigger the federal court's express reservation of ancillary jurisdiction. Thus, the prerequisites for the federal court's retention of jurisdiction had not been met when the trial judge deferred to the federal court's jurisdiction.
Moreover, the retention of jurisdiction was expressly limited to enforcement of the settlement agreement. Neither Langford and Marsh, on the one hand, or the City, on the other, ever sought enforcement of the settlement agreement; indeed, as we have observed, the parties voluntarily hastened to consummate the transaction once the OGI expressed an interest in examining the circumstances that led to the settlement agreement, thus mooting any party's need to invoke the federal court's ostensible authority to compel enforcement.
In addition, the January 31, 2002 order does not express the federal judge's intent to retain jurisdiction over controversies regarding the validity of the settlement agreement, since the federal judge stated only that jurisdiction was retained "to the extent necessary to enforce the terms and conditions" of the settlement (emphasis added). Even if we were to interpret the order's terms broadly, it is clear that the present controversy was not a matter within anyone's contemplation when the *438 January 31, 2002 order was entered because the OGI had not indicated its interest in the matter until at least one month after the order was entered. And, even if suspected, the ripening of this current controversy was not expressed by the federal district judge as a basis for the exercise of ancillary jurisdiction. Kokkonen makes clear that an "unexpressed intent" to retain jurisdiction is insufficient to confer jurisdiction over such a dispute. See Bowen v. Monus (In re Phar-Mor Inc.), 172 F.3d 270, 275 (3rd Cir.1999). In short, we conclude that the trial judge mistakenly deferred to the federal court's ancillary jurisdiction, which the federal judge had no expressed interest in exercising and which the federal judge took no steps to retain.

B
We also discern from the trial judge's decision that she believed the rendering of relief in favor of the OGI in this action would be tantamount to both vacating the federal court's order of dismissal and compelling the federal court to adjudicate the suit commenced by Langford and Marsh. We disagree.
The OGI's claim for relief, contrary to what the trial judge's decision suggests, was not dependent upon whether the suit brought by Langford and Marsh in federal court could be or would have to be resuscitated. That relief could still be granted to the OGI  even though the federal suit had been dismissed and even if Langford and Marsh's claims might no longer be actionable in federal court[6]  is demonstrated by an understanding of the scope of the trial court's equitable jurisdiction.
One of the chief equitable maxims declares that "equity will not suffer a wrong without a remedy," Crane v. Bielski, 15 N.J. 342, 349, 104 A.2d 651 (1954), which has alternatively been stated, in a manner acutely applicable here, as "wherever a legal right has been infringed a remedy will be given," 2 Pomeroy's Equity Jurisprudence § 423. Here, the trial judge held  and we agree  that the settlement agreement violated the Faulkner Act and was the product of numerous intolerable conflicts of interest. That ruling vests in the taxpayers, for whom the OGI now speaks, a "legal right" for which a remedy should be given. Admittedly, the peculiarities of the circumstances at hand have laid numerous obstacles in the way of an effective remedy but, as Judge Cardozo famously said, "[l]et the hardship be strong enough, and equity will find a way though many a formula of inaction may seem to bar the path." Graf v. Hope Bldg. Corp., 254 N.Y. 1, 171 N.E. 884, 888 (1930).
A constructive trust is a remedial device through which the "conscience of equity" is expressed; it will be imposed when a person has acquired possession of or title to property under circumstances which, in good conscience, will not allow the property's retention. Flanigan v. Munson, 175 N.J. 597, 608, 818 A.2d 1275 (2003); Stewart v. Harris Structural Steel Co., Inc., 198 N.J.Super. 255, 266, 486 A.2d 1265 (App.Div.1984). In imposing a constructive trust, a court must find that a "wrongful act" caused the property to come into the hands of the recipient and that the recipient will be "unjustly enriched" if it is not returned. Flanigan, supra, 175 N.J. at 608, 818 A.2d 1275. In *439 that circumstance, the court of equity converts the recipient into a trustee and requires that he account for the res in whatever manner the court deems fair and just.
The circumstances in which a constructive trust may be imposed are as extensive as required to reach an equitable result. For example, our courts have imposed such a trust where a co-guarantor failed to pay his proportionate share of a debt, D'Ippolito v. Castoro, 51 N.J. 584, 242 A.2d 617 (1968); where a party has wrongfully diverted insurance proceeds, Hirsch v. Travelers Ins. Co., 134 N.J.Super. 466, 341 A.2d 691 (App.Div.1975); and where a public official accepted bribes, Hyland v. Simmons, 152 N.J.Super. 569, 378 A.2d 260 (Ch.Div.1977), aff'd, 163 N.J.Super. 137, 394 A.2d 376 (App.Div.1978), certif. denied, 79 N.J. 479, 401 A.2d 234 (1979). Such a remedy may be imposed not only when the suitor never had a right to the res, but also when the property was lawfully acquired but not utilized in the intended manner, as in Trustees of Client's Security Fund v. Yucht, 243 N.J.Super. 97, 131, 578 A.2d 900 (Ch.Div.1989). The constructive trust device by no means requires a criminal act; it requires a "wrongful act," which our Supreme Court has described as including but is "not limited to, fraud, mistake, undue influence, or breach of a confidential relationship which has resulted in the transfer of property." D'Ippolito, supra, 51 N.J. at 589, 242 A.2d 617. Simply, the imposition of a constructive trust requires a two-part finding that the res has been received or retained through a "wrongful act" which "unjustly enriches" the recipient. Flanigan, supra, 175 N.J. at 608, 818 A.2d 1275.
The "wrongful act" element has been well-established in this case. Langford and Marsh obtained funds from the City through an unlawful procedure. What remains is the question of whether they have been "unjustly enriched." It is the uncertainty about this second required element  because the worth of the federal claims are unknown  which generated both the unusual problem posed by this case and the trial judge's uneasiness about a constructive trust's impact upon the status of the federal action. We conclude that the "unjust enrichment" element of the OGI's constructive trust claim may be resolved and that a remedy may issue, if that element is eventually met, without offending the sovereignty of the federal court.
The judge's refusal to grant relief because of a concern of an impact on the federal court's January 31, 2002 order, we conclude, misapprehended the broad and flexible nature of the court's equity jurisdiction. "Equity fashions a trust with flexible adaptation to the call of the occasion." Adams v. Champion, 294 U.S. 231, 237, 55 S.Ct. 399, 401, 79 L.Ed. 880, 884 (1935). Again considering that the settlement funds came into the hands of Langford and Marsh by way of a process that did not conform to the Faulkner Act, and in that sense was "wrongful," the first element for the imposition of a constructive trust, has been firmly established. However, in order to find that Langford and Marsh have been "unjustly enriched" by the invalid settlement agreement  the second element necessary for the imposition of a constructive trust, Flanigan, supra, 175 N.J. at 608, 818 A.2d 1275  it must be determined whether the amount paid by the City to settle the federal action was fair and reasonable. This latter question remains uncertain and the trial judge was understandably concerned that to pursue this remedy would require further proceedings in the federal court, which she *440 was not empowered to compel.[7] We agree that our courts have no power to compel the federal courts to take any course of action, but we do not agree that the trial judge could not direct Langford and Marsh, or the City, to seek relief from the January 31, 2002 court order, nor do we agree  if the federal court were to determine that the order should not be vacated  that there would then be no available forum for a determination as to whether the funds paid in settlement represented a fair price for the dismissal of the federal action.
Although a state court has no power to direct the federal court in any sense, the trial court does have jurisdiction over the parties to the federal action and may act upon that fact. That is, in the words of the ancient maxim, equity acts in personam (aequitas agit in personam). See Starr v. Berry, 25 N.J. 573, 589, 138 A.2d 44 (1958); Vreeland v. Vreeland, 49 N.J.Eq. 322, 326, 24 A. 551 (E. & A. 1892). Thus, the trial judge, in seeking an understanding of the reasonableness of the settlement, could have directed Langford and Marsh, or the City, or all of them, to seek the vacation of the January 31, 2002 order. Should the federal judge grant that relief, then the mechanism would exist for a resolution of Langford and Marsh's claims and, ultimately, for a determination of the value of Langford and Marsh's federal claims, which would be conclusive as to the "unjust enrichment" element of the OGI's constructive trust claim.
In addition, the denial of such an application by the federal judge still would not pose an insurmountable obstacle to the relief sought by the OGI. It is in that instance that equity's flexibility provides a remedy, for we can see no reason why the trial court could not determine whether the amount of the settlement  regardless of how formed  is reasonable. That may involve the judge's hearing and weighing of the evidence which the federal court would have heard in adjudicating the merits of the claims, a circumstance not unfamiliar to our courts. For example, where an attorney has been sued by a former client for failing to file a suit within the time prescribed by the statute of limitations, our courts will often require the presentation of proofs in the nature of a "suit within a suit" in order to ascertain the damages proximately caused by the attorney's negligence. See, e.g., Jerista v. Murray, 185 N.J. 175, 191, 883 A.2d 350 (2005); Garcia v. Kozlov, Seaton, Romanini, 179 N.J. 343, 358, 845 A.2d 602 (2004); Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 343-44, 419 A.2d 417 (1980). Similarly, if no relief is available to the parties in this action in federal court, then the trial judge should endeavor to determine the value of the claims of Langford and Marsh  by hearing proofs in the nature of a "suit within a suit"  in concluding whether or to what extent the funds paid by the City represented reasonable compensation for the release of the federal suit and, thus, whether Langford and Marsh have been "unjustly enriched."

IV
To summarize, we conclude that the trial judge correctly declared the settlement agreement to be invalid, but we reject the judge's determination that no remedy was available to the OGI.
*441 In remanding, we first direct that the trial judge forthwith enter an appropriate order, after allowing the parties a full and fair opportunity to be heard, regarding the pendente lite disposition of the settlement proceeds. We offer no view as to the outcome of such a determination, but the judge should consider whether Langford and Marsh should be immediately required to turnover the settlement funds, in whole or in part, or provide security for the return of the funds, in whole or in part, or whether a turnover should await further proceedings and a better understanding of the fairness of the settlement agreement. Those questions are left, in the first instance, to the sound discretion of the trial judge. We also do not foreclose the judge's revisiting of this issue between now and the entry of final judgment as more is learned about the value, if any, of Langford and Marsh's federal claims.
Second, notwithstanding whatever order the judge may issue regarding the pendente lite disposition of the settlement proceeds, the trial judge should also forthwith direct the parties to the federal action to seek relief, in the federal court, from the January 31, 2002 order. To repeat what we said earlier, the judge should not attempt to direct the federal judge to do anything; the trial judge is empowered only to direct the parties to seek relief from the federal court. As we have indicated, should the federal judge grant relief and reopen the federal action, then a forum will have been created for the adjudication of Langford and Marsh's claims and the outcome of that action will significantly control the ultimate disposition of the settlement proceeds; however, should the federal judge deny relief, then, subject to any appeal that may be taken from such an order,[8] the trial judge should proceed to determine the reasonableness of the settlement agreement which determination should include, if necessary to a full and fair resolution of that issue, a "trial" of the federal suit within the trial of the OGI's suit.
Third, now that we have determined that the January 31, 2002 order does not constitute an insurmountable barrier to a resolution of the OGI's claims, the trial judge may consider the availability of any other legal or equitable remedies that may be appropriate to alleviate the consequences of the invalid settlement agreement. In directing the bulk of our attention to the availability of a constructive trust, we by no means intend to suggest that other equitable or legal remedies are not also available.
Affirmed in part, reversed in part, and remanded for further proceedings in conformity with the content and spirit of this opinion. We do not retain jurisdiction.
NOTES
[1] Tracy M. Thompson succeeded John Kennedy as acting director during the pendency of this appeal.
[2] On December 27, 1999, the district judge granted a motion to dismiss. The United States Court of Appeals for the Third Circuit reversed the order of dismissal in an opinion filed on December 18, 2000. The parties thereafter engaged in extensive pretrial discovery in the federal action, which included the taking of over twenty depositions.
[3] Langford was then a member of the Council but abstained on the vote regarding this resolution and others regarding the federal suit prior to his being sworn in as mayor in January 2002.
[4] Ercole thought the City should meet the demand of $1,000,000. Fitzgerald did not necessarily disagree but suggested during the executive session that the $1,000,000 recommended by Ercole be reduced to $850,000 because the City was in "a budget emergency."
[5] Having so held, we need not determine whether the trial judge was correct in concluding that the City could never have settled the federal suit so long as Langford remained mayor because that perplexing question is not necessary for our disposition of this appeal.
[6] Although we find no critical significance in the fact that, at this late date, the federal suit might not be reopened, we certainly do not mean to suggest that such relief should not be pursued. Indeed, we think that avenue should be pursued, in the manner mentioned later in this opinion now that we have affirmed that part of the judgment which declared invalid the settlement agreement.
[7] Certainly, the trial judge's concerns about the possible conflict between her actions and the federal court's processes are legitimate. However, we have no reason to suppose that the federal court is not as equally interested in seeing this controversy justly and completely resolved as are we. It is difficult to imagine that the federal court would be more interested in leaving this wrongfully settled case settled than in pursuing whatever steps are appropriate to right this wrong.
[8] We note that the trial judge, on remand, has the discretion to require an aggrieved party to the federal suit to appeal any order entered by the federal district judge denying relief from the January 31, 2002 order. We express no view as to whether the trial judge should exercise her discretion and impose such a requirement.