928 A.2d 37 (2007)
394 N.J. Super. 577
SYNNEX CORPORATION, as Successor in Interest to Synnex Information Technologies, Inc., Plaintiff-Respondent/Cross-Appellant,
v.
ADT SECURITY SERVICES, INC., ADT Operations, Inc., ADT Holdings, Inc., and ADT, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 2007.
Decided July 13, 2007.
*38 Timothy I. Duffy, Morristown, argued the cause for appellants/cross-respondents (Coughlin Duffy, attorneys; Mr. Duffy, of counsel and on the brief; Neil M. Day, on the brief).
Keith E. Whitson, Pittsburgh, PA, of the Pennsylvania Bar, admitted pro hac vice, argued the cause for respondent/cross-appellant (Schnader Harrison Segal & Lewis, attorneys; Harris Neal Feldman and Mr. Whitson, on the brief).
Before Judges SKILLMAN, LISA and GRALL.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The primary question presented by this appeal is whether an exculpatory clause in a contract for the sale of a burglar alarm system, which requires the buyer to rely solely on its own insurance for *39 any loss from theft, is contrary to public policy and therefore unenforceable in light of a statute that subjects sellers of alarm systems to licensing and regulatory controls. We conclude that such an exculpatory clause is not contrary to public policy because it simply allocates responsibility to the buyer of an alarm system to maintain insurance coverage, and the buyer is in the best position to know the value of its property and to insure against any loss.
Plaintiff Synnex is a distributor of information technology products. Defendant ADT is a distributor of burglar alarm systems.
In 2002, Synnex leased a large warehouse in Edison to use as a distribution center for computers and computer-related equipment. Synnex asked ADT to design and install a burglar alarm system for the building. As a result, an ADT account representative met with Synnex's regional operations director and subsequently submitted a series of proposals for the required system.
After the parties reached an agreement concerning the burglar alarm system and purchase price, the ADT sales representative submitted a form ADT contract to the Synnex regional operations director, which they both signed on July 11, 2001. The agreed purchase price was $7,154 plus an annual service charge of $1,142 for a five-year term.
The form ADT contract contained a clause, which stated: "This Agreement is not binding unless approved in writing by an authorized Representative of ADT." Although the contract was signed by an authorized representative of Synnex and the ADT sales representative, it was not signed by an "authorized Representative of ADT."
The parties executed two riders to the contract, which provided for additional equipment for the burglar alarm system. One rider, executed on August 13, 2002, provided for the addition of door contacts, a motion sensor and related equipment for an additional one-time charge of $1,308, plus annual charges of $56. The second rider, executed on September 24, 2002, provided for various other alarm-related parts and services for a one-time charge of $1,086, plus annual charges of $31. The riders stated that they were "part of" the original contract, which "shall . . . remain in full force and effect in accordance with all of the terms and conditions thereof, modified only as in this Rider specifically provided." Both riders were subsequently executed by a person designated as an "authorized Representative of ADT."
The form ADT contract includes a broad exculpatory clause, set forth in large capital letters, around which this appeal revolves, which states in pertinent part:
IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES. CUSTOMER AGREES TO LOOK EXCLUSIVELY TO CUSTOMER'S INSURER TO RECOVER FOR INJURIES OR DAMAGE IN THE EVENT OF ANY LOSS OR INJURY AND RELEASES AND WAIVES ALL RIGHT OF RECOVERY AGAINST ADT ARISING BY WAY OF SUBROGATION. ADT MAKES NO GUARANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY *40 OR FITNESS, THAT THE SYSTEM OR SERVICES SUPPLIED, WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT. IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES, IF ANY, WHICH MAY PROXIMATELY RESULT FROM FAILURE ON THE PART OF ADT TO PERFORM ANY OF ITS OBLIGATIONS HEREUNDER. THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL LIABILITY OF ADT AND AGREES THAT ADT SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCES, OR CONSEQUENCES THEREFROM, WHICH THE SERVICE OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE, OR $1,000, WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY, AS THE EXCLUSIVE REMEDY; AND THAT THE PROVISIONS OF THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE OR INJURY, IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF ANY APPLICABLE CONSUMER PROTECTION LAW OR ANY OTHER ALLEGED FAULT ON THE PART OF ADT, ITS AGENCY OR EMPLOYEES.
After execution of the two riders, ADT installed the burglar alarm system in the Synnex warehouse sometime in the late summer and early fall of 2002.
Approximately six months after installation of this system, someone broke into the warehouse and stole a substantial quantity of computers and computer equipment. A post-crime investigation revealed that the intruders disabled or destroyed parts of the alarm system, including the cellular backup. Following the break-in, Synnex installed additional security features, including a two-way radio and more motion detectors in both the warehouse and control room.
The company that insured the contents of the warehouse, Mitsui Sumitomo Insurance Group, paid Synnex $7.1 million in settlement of its claim for the merchandise and equipment lost as a result of the burglary and then brought this subrogation action in Synnex's name. The complaint alleged that ADT had been negligent both in designing the burglar alarm system and in communicating with Synnex after it received alarm signals on the night of the burglary. The complaint also asserted claims for breach of express and implied warranties, strict liability, wanton and wilful misconduct, negligent misrepresentation and violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20.
ADT filed a series of motions for summary judgment based on the previously quoted exculpatory clause, the disposition of which was complicated by the fact that they were heard by different judges. The trial court eventually granted summary *41 judgment with respect to Synnex's strict liability claim and part of its Consumer Fraud Act claim, but denied summary judgment with respect to Synnex's other claims. The court ruled that the absence of the signature of an "authorized Representative of ADT" on the original contract precluded ADT from relying upon the exculpatory clause. The court also ruled that, even if the contract had been signed by ADT's authorized representative, the exculpatory clause would have been ineffective because it was contrary to public policy as expressed in a 1997 amendment to the Electrical Contractors Licensing Act, N.J.S.A. 45:5A-1 to -38, which extended the statute to alarm companies. L. 1999, c. 305.
The case was tried before a jury. The trial court dismissed Synnex's wanton and wilful misconduct, breach of express warranties, negligent misrepresentation, breach of implied warranties and Consumer Fraud Act claims during the course of trial. The jury returned a verdict finding Synnex and ADT each 50% negligent and determining that the total losses sustained by Synnex as a result of the burglary were $7,645,580. The court molded the verdict and entered a judgment for $3,822,740 plus prejudgment interest in Synnex's favor. The court subsequently denied ADT's motion for judgment notwithstanding the verdict.
ADT appeals from the judgment in Synnex's favor, arguing that the previously quoted exculpatory clause was part of its contract for the sale of a burglar alarm system to Synnex, even though the contract was not signed by a person designated as an "authorized Representative of ADT," and that this clause is not contrary to public policy. Synnex has filed a conditional cross-appeal from the dismissal of its Consumer Fraud Act, breach of implied warranties and wanton and wilful misconduct claims.
We conclude that ADT's performance of the contract with Synnex by delivery and installation of the burglar alarm system constituted acceptance of the contract, despite the absence of a signature by an authorized representative of ADT, thus binding both parties to the terms of that contract, including the exculpatory clause. We also conclude that the exculpatory clause is not unenforceable as contrary to public policy because it simply allocates responsibility to Synnex to maintain insurance coverage for the theft of its property. We reject the arguments Synnex presents in support of its conditional cross-appeal as clearly without merit.

I
The form ADT contract contains three blanks for signatures: one for the ADT sales representative, the second for the customer and the third for an "authorized Representative of ADT." The form contract states in the lower right hand corner:
This Agreement is not binding unless approved in writing by an authorized Representative of ADT. In the event of failure of such approval, the only liability of ADT shall be to return to the Customer the amount, if any, paid to ADT upon signing of this Agreement.
Both the ADT sales representative and an authorized representative for Synnex signed the original contract. However, the contract was not signed by an "authorized Representative of ADT." The trial court ruled that due to the absence of this signature, the contract, including the exculpatory clause relied upon by ADT, never became effective.
There is no doubt a party may condition its acceptance of a contract upon the approval of the "home office" or a *42 higher level company official, and in the absence of such approval, there is no binding contract. As we explained in Iacono v. Toll Brothers, 217 N.J.Super. 475, 478, 526 A.2d 256 (App.Div.1987)(quoting 1 Corbin on Contracts § 61 (2 ed.1963)):
[I]f one who initiates a transaction or one who solicits offers expressly provides that he will not be bound by a contract until "approval at the home office" or until the expression of approval by an attorney or engineer, there will be no contract until that approval takes place, unless there are subsequent expressions of agreement to be bound without it.
If the party who has reserved the right to home office approval of a proposed contract indicates its unqualified acceptance in some other manner, such as by performance in accordance with the contract, the parties will be bound by the contract. Corbin contains an explanation of this alternative form of acceptance of a proposed contract with a home office approval provision:
[W]here a manufacturer through a sales representative successfully solicits an order, the solicitation may result in the customer signing an order form prepared by the manufacturer. Usually this order form casts the customer in the role of the offeror. The form may specify that the manufacturer will be bound only by the signed acceptance at the home office. Such forms should be interpreted realistically and such maxims as "the offeror is master of the offer" should be applied warily in this context. If the offeree authored the form and the clauses providing for the means of acceptance, it should have the power to waive such clauses, unless the offeror has relied on the terms of the offer.

[1 Corbin on Contracts § 3.34 (Perillo rev. ed.1993) (emphasis added).]
The most unequivocal form of waiver of a provision of a contract reserving the right to home office approval is full performance by the party who has reserved that right. See H.J., Inc. v. Int'l Tel. & Tel. Corp., 867 F.2d 1531, 1545-46 (8th Cir.1989); Lanier Worldwide, Inc. v. Clouse, 875 So.2d 292, 296-97 (Ala.2003); Columbia Weighing Mach. Co. v. Vaughan, 123 Kan. 474, 255 P. 973, 974 (1927). Indeed, even part performance is generally considered to be a sufficient expression of an intent to be bound by the contract without the formality of home office approval. See Empire Mach. Co. v. Litton Bus. Tel. Sys., 115 Ariz. 568, 566 P.2d 1044, 1048-49 (Ct.App.1977); Ludowici-Celadon Co. v. McKinley, 307 Mich. 149, 11 N.W.2d 839, 840-41 (1943); see generally, Corbin, supra, § 3.34 at 489-90 (noting that "[t]he assent of the soliciting party may be sufficiently expressed by actually making one or more shipments of the goods ordered.").[1]
The rationale of these cases is that a seller includes a home office approval provision in its form contract solely for its *43 own protection, to give its upper level officials an opportunity to review and approve the contract before it will be bound. Consequently, the seller can waive the requirement of such approval by an alternative form of acceptance, such as shipment of the goods or other performance in accordance with the terms of the contract.
Under this authority, ADT's shipment and installation of the security system at the Synnex warehouse and subsequent monitoring constituted an unequivocal acceptance of the contract. Moreover, Synnex's receipt and payment for these goods and services reflected its understanding that it had contracted with ADT in accordance with the terms of the ADT form contract. Once the security system was delivered and installed, Synnex had no interest in whether an authorized representative of ADT had signed the contract. Synnex's sole interest was in obtaining the goods and services it had contracted to buy. In fact, Synnex apparently did not become aware an authorized representative of ADT had not signed the contract until ADT's copy of the contract was produced in discovery.
The language of the home office approval provision of the ADT form contract reinforces the conclusion that it was only intended to be operative before ADT had undertaken performance. The second sentence states that "[i]n the event of failure of such [home office] approval, the only liability of ADT shall be to return to the Customer the amount, if any, paid to ADT upon signing of this Agreement." This is obviously a remedy that would be feasible only before ADT's delivery and installation of the burglar alarm system and the buyer's payment of the balance of the purchase price. Therefore, we conclude that ADT's performance of the contract by delivery and installation of the security system constituted acceptance without formal home office approval, thus binding both parties to the terms of that contract, including the exculpatory clause.
Moreover, although not essential to our decision, we note that ADT's authorized representative did sign both riders to the contract, which were executed before it was performed. Those riders state that they are "part of" the original contract, which "shall . . . remain in full force and effect in accordance with all of the terms and conditions thereof, modified only as [the riders] specifically provide[ ]." Consequently, ADT's authorized representative's approvals of the riders would have been sufficient to bind ADT to the contract even if it had not subsequently undertaken substantial performance.

II
Synnex argues that the validity of the exculpatory clause is not properly before us because ADT failed to appeal from the order granting Synnex summary judgment on this issue. However, ADT's notice of appeal states that its appeal is from the "judgment," which encompasses all interlocutory orders upon which the judgment is based, In re Carton, 48 N.J. 9, 15, 222 A.2d 92 (1966), and the ADT case information statement identifies the November 10, 2005 order granting Synnex's motion for partial summary judgment on the issue of the validity of the exculpatory clause as one of the orders from which ADT appeals. Moreover, the text of ADT's case information statement clearly indicates that the validity of the exculpatory clause is one of the primary issues presented by the appeal. Therefore, the issue is properly before us.
We have previously upheld the validity of exculpatory clauses in contracts for the sale of fire and burglar alarm systems *44 similar to the one contained in the contract between ADT and Synnex. See Tessler & Son, Inc. v. Sonitrol Sec. Sys., 203 N.J.Super. 477, 481-86, 497 A.2d 530 (App.Div. 1985); Abel Holding Co. v. Am. Dist. Tel. Co., 147 N.J.Super. 263, 267, 371 A.2d 111 (App.Div.1977), aff'g 138 N.J.Super. 137, 145-60, 350 A.2d 292 (Law Div.1975); Foont-Freedenfeld Corp. v. Electro-Protective Corp., 126 N.J.Super. 254, 257-58, 314 A.2d 69 (App.Div.1973), aff'd o.b., 64 N.J. 197, 314 A.2d 68 (1974). In Tessler, we held that such "[e]xculpatory clauses . . . are valid where they do not adversely affect the public interest, where the exculpated party is not under a public duty to perform, as in the case of a public utility or common carrier, and where the contract does not grow out of unequal bargaining power or is otherwise unconscionable." 203 N.J.Super. at 482-83, 497 A.2d 530. We also held that such clauses may insulate an alarm company from liability even for "very negligent or grossly negligent performance." Id. at 485, 497 A.2d 530.
Other jurisdictions also generally uphold the validity of exculpatory clauses in alarm company contracts. See, e.g., Leon's Bakery, Inc. v. Grinnell Corp., 990 F.2d 44, 48-50 (2d Cir.1993); E.H. Ashley & Co. v. Wells Fargo Alarm Servs., 907 F.2d 1274, 1277-79 (1st Cir.1990); Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech, Inc., 902 So.2d 46, 52-55 (Ala. 2004); Fireman's Fund Am. Ins. Cos. v. Burns Elec. Sec. Servs., 93 Ill.App.3d 298, 48 Ill.Dec. 729, 417 N.E.2d 131, 132-34 (1980); St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co., 115 Mich.App. 278, 320 N.W.2d 244, 247 (1982); Lobianco v. Prop. Prot., Inc., 292 Pa.Super. 346, 437 A.2d 417, 420-21 (1981); Ostalkiewicz v. Guardian Alarm, 520 A.2d 563, 565-66 (R.I.1987); Houghland v. Sec. Alarms & Servs., 755 S.W.2d 769, 773 (Tenn.1988); see generally, Martin J. McMahon, Annotation, Liability of Person Furnishing, Installing, or Servicing Burglary or Fire Alarm System for Burglary or Fire Loss, 37 A.L.R.4th 47 (1985) (listing cases).
The essential rationale of cases upholding the validity of such exculpatory clauses is that a property owner generally will maintain insurance coverage on its property, especially if it is valuable, and that the property owner "is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium[.]" Leon's Bakery, supra, 990 F.2d at 49. Thus, the practical effect of an exculpatory clause in a contract for the sale of an alarm system is to foreclose an insurance company that has paid the owner for the loss from maintaining a subrogation action against the seller of the alarm system. The ADT form contract expressly recognizes this purpose of the exculpatory clause, by providing that "[c]ustomer agrees to look exclusively to customer's insurer to recover for injuries or damage in the event of any loss or injury and releases and waives all right of recovery against ADT arising by way of subrogation."
Our courts have also recognized the appropriateness of exculpatory clauses designed to allocate responsibility for maintenance of insurance coverage and to avoid subrogation actions by insurance companies that attempt to shift responsibility for a covered loss to another party. See, e.g., Mayfair Fabrics v. Henley, 48 N.J. 483, 488-89, 226 A.2d 602 (1967); Sch. Alliance Ins. Fund v. Fama Constr. Co., 353 N.J.Super. 131, 136-41, 801 A.2d 459 (Law Div.2001), aff'd o.b., 353 N.J.Super. 1, 801 A.2d 334 (App.Div.2002).
Despite the firmly established authority both in New Jersey and other jurisdictions upholding the validity of *45 exculpatory clauses in contracts for the sale of alarm systems, the trial court accepted Synnex's argument that such a clause is now contrary to public policy due to the 1997 amendments to the Electrical Contractors Licensing Act extending its regulatory provisions to alarm companies. This legislation requires persons and companies engaged in the alarm business to obtain licenses, N.J.S.A. 45:5A-26, 27, and to conduct business in conformity with the enabling statute and implementing regulations adopted by the Board of Electrical Contractors, N.J.S.A. 45:5A-32, 35, 38. However, this legislation does not create a private cause of action for a violation of its provisions or prescribe rules of civil liability for licensees.[2] Consequently, the liability of licensees for negligence or other tortious conduct continues to be governed by common law. See Alloway v. Bradlees, Inc., 157 N.J. 221, 234-36, 723 A.2d 960 (1999); Baxt v. Liloia, 155 N.J. 190, 197-204, 714 A.2d 271 (1998).
In arguing that the extension of the Electrical Contractors Licensing Act to alarm businesses constitutes a legislative expression of public policy that requires invalidation of exculpatory clauses in alarm company contracts, Synnex relies primarily upon Lucier v. Williams, 366 N.J.Super. 485, 841 A.2d 907 (App.Div. 2004), which involved the validity of a home inspection contract that significantly limited the inspector's liability for negligence. We indicated that in determining the validity of such a provision, a court should consider "not only [the] adhesive nature [of the contract], but also `the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the "adhering" party, and the public interests affected by the contract." Id. at 492, 841 A.2d 907 (quoting Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 356, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992)). We also indicated that a court should consider "whether the limitation is a reasonable allocation of risk between the parties or whether it runs afoul of the public policy disfavoring clauses which effectively immunize parties from liability for their own negligent actions." Ibid. Applying these considerations, we concluded that the limitation of liability provision of the home inspection contract was unconscionable and in contravention of public policy because, among other reasons, "the parties, one a consumer and the other a professional expert, have grossly unequal bargaining status" and "the provision is contrary to our state's public policy of effectuating the purpose of a home inspection contract to render reliable evaluation of a home's fitness for purchase[.]" Id. at 493, 841 A.2d 907.
We conclude that the reasons for invalidation of the limitation of liability provision in a home inspection contract identified in Lucier do not apply to the burglar alarm system contract involved in this case. Although *46 the contract between ADT and Synnex was an ADT form contract, there was no "gross[ ] inequality of bargaining power" between the parties. Ibid. Synnex is a large corporation that could have negotiated for a contract without an exculpatory clause or purchased a security system from another vendor. Moreover, we do not believe that exposure to liability for negligence in the design, installation or servicing of a burglar alarm system is necessary to encourage a company such as ADT to render reliable service to its customers. ADT's interest in maintaining its business reputation with potential buyers such as Synnex and insurers of those buyers provides sufficient incentive for proper performance of its contractual responsibilities, without the added incentive that could be provided by the threat of potential tort liability.
Moreover, there are significant policy considerations that militate against imposition of tort liability against an alarm company such as ADT that do not apply to home inspectors. In Lucier, we noted that the $500,000 of errors and omissions coverage required by the applicable statute would provide home inspectors with adequate protection from liability for their negligence, while enforcement of a limitation of liability clause would leave a home buyer without any recourse for the inspector's negligence, with a "potentially severe [economic impact] to the home buyer[.]" Id. at 499, 841 A.2d 907. Furthermore, although not discussed in Lucier, we are not aware of any readily available insurance by which a home buyer may obtain coverage for a defect in the home that is not disclosed by a home inspection.
In contrast, where the subject matter of a contract containing a limitation of liability or exculpatory clause is an alarm contract, the buyer is in the best position to know the value of its property and to insure against any loss from fire or theft, regardless of whether the alarm company's negligence was a contributing cause of the occurrence. As the contract between ADT and Synnex illustrates, the purchase price of an alarm system is generally only a small fraction of the value of the property it is designed to protect. If an alarm company were subject to liability for loss of that property, it would be hesitant to sell an alarm system to a buyer with valuable property or would insist upon payment of a premium to offset its exposure to a claim. The requirement of payment of such a premium would place the alarm company in the position of selling not only an alarm system but also a form of insurance. Thus, to determine the price for an alarm system, the company would have to determine the value of the buyer's property and its contents as well as other pertinent risk factors, such as its location, which would be similar to an insurance company's determination of the premium for a casualty insurance policy. Furthermore, insurance coverage for loss from fire or theft is readily available and is in fact maintained by most property owners including Synnex. Therefore, unlike a home buyer who contracts for a home inspection, the purchaser of an alarm system does not have to rely upon the availability of a tort claim against the seller of the system to obtain protection from loss of its property.
Synnex relies on the fact that the Electrical Contractors Licensing Act requires alarm companies to maintain insurance coverage and that we concluded in Lucier that a similar provision in the legislation governing home inspectors "evinces a clear expression of policy that home inspectors shall not only provide recourse by being fully liable for their errors and omissions, but shall maintain substantial insurance coverage to assure payment for any such liability." 366 N.J.Super. at 497, 841 A.2d 907. However, there are significant differences *47 between the insurance mandated by the Home Inspection Professional Licensing Act, N.J.S.A. 45:8-61 to -77, and the insurance requirement imposed upon alarm companies.
A home inspector is required to maintain an "errors and omissions" policy with minimum coverage of $500,000 per occurrence. N.J.S.A. 45:8-76(a). An errors and omissions policy provides coverage to a party engaged in a profession or occupation for negligence in the performance of the services provided to those with whom it contracts. See Search EDP, Inc. v. Am. Home Assurance Co., 267 N.J.Super. 537, 541-42, 632 A.2d 286 (App.Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994) (noting that "the essential purpose of an errors and omissions policy is to cover liability risks unique to and inherent in the practice of a particular profession" and that such a policy "does not cover general business liability."); see also 7A John Alan Appleman, Insurance Law and Practice § 4504.01 (Walter F. Berdal ed.1979) (noting that "[a]n errors-and-omissions policy is professional-liability insurance providing a specialized and limited type of coverage as compared to comprehensive insurance[,]" which "is designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the professions.").
An alarm company is required to maintain "general liability" insurance in an amount determined by the Board of Examiners of Electrical Contractors, N.J.S.A. 45:5A-32(a)(4), which the Board has fixed at $1,000,000, N.J.A.C. 13:31A-3.5(a)(4). A "general liability" policy ordinarily does not provide coverage to the insured for liability it may incur for negligence in the conduct of its profession or occupation. See Search EDP, supra, 267 N.J.Super. at 541, 632 A.2d 286 (noting that "general liability policies and errors and omissions policies . . . are intended to cover different categories of risk[,]" and that ordinarily a "general liability policy does not cover professional negligence").
Although a general liability policy would not provide coverage to an alarm company for a negligence claim by one of its customers, it would provide coverage for a personal injury or property damage claim by a party other than the buyer of the alarm system. Thus, the insurance coverage mandated by N.J.S.A. 45:5A-32(a)(4) was apparently designed to assure the financial responsibility of alarm companies for such liability. Therefore, the legislative requirement that alarm companies maintain general liability insurance does not provide a basis for inferring a legislative intent to preclude alarm companies from including exculpatory clauses in their sales contracts that place the obligation upon the buyer to insure against loss of its own property.
Finally, we emphasize that this case only involves the validity of an exculpatory clause as applied to property loss for which the buyer of an alarm system may obtain its own insurance coverage. It does not involve the validity of such a clause as applied to a personal injury claim, with respect to which different policy considerations would have to be evaluated. See Hojnowski v. Vans Skate Park, 187 N.J. 323, 333, 901 A.2d 381 (2006); McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 48 N.J. 539, 543, 226 A.2d 713 (1967).

III
Synnex has filed what it characterizes as a "conditional" cross-appeal, which presents issues that Synnex states "need only be addressed in the event that this Court were to decide to remand the case to the trial court for further proceedings." This *48 court has reversed the judgment in Synnex's favor without a remand. Therefore, it is unclear whether there is any need for us to address the cross-appeal.
In any event, the issues presented by the cross-appeal, which challenges the dismissal of Synnex's claims for alleged violations of the Consumer Fraud Act, breach of an implied warranty of fitness for a particular purpose and wilful and wanton misconduct, are clearly without merit and do not warrant any discussion in addition to the reasons stated by the trial court. R. 2:11-3(e)(1)(E).
Accordingly, the judgment in favor of Synnex is reversed and the case dismissed.
NOTES
[1] Synnex relies upon several Pennsylvania decisions, Franklin Interiors v. Wall of Fame Management Co., 510 Pa. 597, 511 A.2d 761 (1986); Cucchi v. Rollins Protective Services Co., 377 Pa.Super. 9, 546 A.2d 1131 (1988) rev'd on other grounds, 524 Pa. 514, 574 A.2d 565 (1990), and a decision by the Third Circuit Court of Appeals, interpreting Pennsylvania law, InfoComp, Inc. v. Electra Products, Inc., 109 F.3d 902 (3rd Cir.1997), which it contends stand for the proposition that where a contract contains a home office approval provision, acceptance cannot be established by the seller's performance of the contract. We have no need to decide whether this is a correct statement of current Pennsylvania law because even if it were, it would be inconsistent with prevailing law in other jurisdictions which we follow in this decision.
[2] Synnex suggests that N.J.S.A. 45:5A-35(a), which imposes responsibility upon an alarm company for the unlawful or unprofessional conduct of one of its employees, addresses the issue of civil liability. However, this subsection states in its entirety:

A licensee shall be responsible for any unlawful or unprofessional conduct by an employee, except that the conduct shall not be a cause for suspension or revocation of a license, unless the board determines that the licensee had knowledge thereof, or there is shown to have existed a pattern of unlawful or unprofessional conduct.
Therefore, it is clear N.J.S.A. 45:5A-35(a) deals solely with the circumstances under which an alarm company's license may be suspended or revoked for the unlawful or unprofessional conduct of one of its employees, and not with issues of civil liability, which continue to be governed by common law.