**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2234-19T1

JANETTE FAULK, as guardian
of the person of HARRY FAULK,
a/k/a HAROLD C. FAULK, an
adjudged incapacitated person,

     Plaintiff-Respondent,

v.

ANNE MARTUCCI,

     Defendant-Appellant.

_____

Submitted January 11, 2021- Decided January 26, 2021

Before Judges Fasciale and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Hudson County, Docket No. C-000160-18.

Genova Burns, LLC, attorneys for appellant (Matthew I.W. Baker, of counsel and on the briefs).

Vincent J. LaPaglia, attorney for respondent.

PER CURIAM

Defendant Anne Martucci (Anne) appeals from a December 24, 2019 order awarding a constructive trust in favor of plaintiff Janette Faulk (Janette) as guardian of Harry Faulk (Harry), an adjudged incapacitated person. We affirm.

Harry began his career in construction demolition and later transitioned to heavy-equipment and machinery scrap sales. He operated Quick Way Contracting Company (Quick Way) on property located on Tax Block 284, Lots 9.01, 10.02, 9.03, and 11.04 in Kearny. Lots 9.01 and 10.02 are referred to as the "front lots," while Lots 9.03 and 11.04 are referred to as the "back lots" of the property colloquially known as the Meadows.

In the 1980s, Harry was a member of Harrison Station, a partnership compromised of Harry and two others. On January 11, 1982, Harrison Station purchased the front lots for $50,000 from Erie Lackawanna Railway Company. Thereafter, Harry purchased the lots from Harrison Station. Ralph Fucetola, Esq. (Fucetola), Harry's friend and personal attorney, represented him in the transaction.

Anne worked as Harry's secretary and bookkeeper. Harry was previously married but never divorced. Anne and Harry's professional relationship

eventually became a personal one. The two had a martial-type relationship for forty years.

On December 1, 1983, Fucetola created Edgar-Charles Realty Corporation (Edgar-Charles) for Harry with Anne as incorporator and co-trustee, along with Harry's sister, June Ochsner (June). On April 12, 1984, Harry transferred title to the front lots to Edgar-Charles for nominal consideration. Fucetola represented both Harry and Edgar-Charles in the transaction. When the back lots became available for purchase in 1984, Fucetola again represented both parties in the transaction.

From 1983 onward, Harry operated Quick Way on the premises. Edgar-Charles did not use or maintain the property, it conducted no business other than holding legal title to the Meadows, and it did not have a bank account.

On June 6, 1987, June's attorney resigned her subscription in Edgar-Charles and received nothing from her subscription. On June 23, 2005, defendant, for Edgar-Charles, transferred the back lots to Anne Martucci, Inc. by quitclaim deed for nominal consideration. The deed made no mention of how the grantor acquired its interest. Defendant conceded that Harry did not acknowledge the transfer of title of the front lots in writing.

A-2234-19T1

In 2014, Harry suffered a stroke which rendered him physically and mentally incapacitated. Thereafter, on April 13, 2015, on behalf of Edgar-Charles, defendant deeded the front lots to herself for nominal consideration. That same day, Anne Martucci, Inc., deeded the back lots to herself for nominal consideration, therefore assuming complete and personal ownership of the Meadows.

In August 2018, Harry's daughter Janette sought and was granted appointment as guardian of Harry. After learning of the contested interest in the property, and acting as guardian of the person, plaintiff filed her complaint on October 10, 2018, seeking to void defendant's legal title to the Meadows. On November 28, 2018, defendant filed a motion to dismiss for lack of standing, which plaintiff opposed. On January 4, 2019, the trial judge entered an order denying the motion. Thereafter, on January 15, 2019, defendant filed her answer.

Judge Jeffrey R. Jablonski presided over a bench trial from August 26, 2019 to August 28, 2019. Thereafter, on December 24, 2019, the judge entered the order under review and rendered a comprehensive written opinion. The judge found that Harry retained an equitable interest in the property and that Anne wrongfully transferred the property to herself. After imposing the

constructive trust for Harry, he ordered Anne to transfer the property and provide an accounting, which the judge gave Janette the right to recover.

On February 5, 2020, defendant filed this appeal. According to the notice of appeal and the case information statement (CIS), defendant appeals exclusively from the December 24, 2019 order.

On appeal, defendant raises the following arguments for this court's consideration:

> POINT I
>
> THE PLAINTIFF, AS STATUTORY GUARDIAN OF THE PERSON OF HARRY . . . , LACKED STANDING TO INSTITUTE THIS ACTION SEEKING RECOVERY OF PROPERTY ALLEGED TO HAVE BEEN HELD IN CONSTRUCTIVE TRUST BY DEFENDANT RESULTING FROM TRANSFERS OVER THIRTY-FIVE YEARS AGO. RATHER, THAT POWER RESIDED EXCLUSIVELY IN THE APPOINTED GUARDIAN OF [HARRY'S] PROPERTY[.]
>
> POINT II
>
> THE TRIAL JUDGE ERRED IN CONCLUDING THAT PLAINTIFF HAD SUSTAINED HER BURDEN OF PROVING, BY CLEAR AND CONVINCING EVIDENCE, THE ELEMENTS REQUIRED FOR IMPOSITION OF A CONSTRUCTIVE TRUST. AS A RESULT, DEFENDANT'S MOTION TO DISMISS SHOULD HAVE BEEN GRANTED[.]

POINT III

THE TRAL [JUDGE'S] OPINION IS SO FATALLY
FLAWED, INCLUDING UNSUPPORTED
ASSERTION[S] OF FACT AND ERRONEOUS
CONCLUSIONS OF LAW, THAT IT MUST BE SET
ASIDE[.]

POINT IV

THE CASE SHOULD HAVE BEEN, AND MUST
NOW BE, DISMISSED ON THE BASIS OF
LACHES[.]

POINT V

THE TRIAL [JUDGE] COMMITTED PREJUDICIAL
ERROR BY PERMITTING THE CROSS-
EXAMINATION OF DEFENDANT'S SOLE AND
CRUCIAL WITNESS, AN ATTORNEY, ON
PROFESSIONAL ETHICS VIOLATIONS
COMMITTED BY HIM OVER A PERIOD OF
YEARS, NONE OF WHICH TOUCH ON THE
SUBJECT MATTER OF HIS TESTIMONY AND
THEREBY DID NOT SERVE TO IMPEACH HIM. IT
WAS ALSO ERROR TO PERMIT IMPEACHMENT
OF THAT WITNESS BY HIS FAILURE TO OBTAIN
A WRITTEN WAIVER OF A POTENTIAL
CONFLICT OF INTEREST, WHEN THE RULES OF
PROFESSIONAL CONDUCT APPLICABLE AT THE
TIME DID NOT REQUIRE A WRITTEN WAIVER[.]

Defendant also raises the following arguments in reply, which we have

renumbered:

6

POINT [VI]

PLAINTIFF LACKED STANDING TO INSTITUTE AND PROSECUTE THIS ACTION.

A. The Issue is Properly Before this Court.

B. On the Merits, the [T]rial [Judge's] Ruling [W]as [I]n [E]rror.

POINT [VII]

PLAINTIFF FAILED TO PROVE AN ACTIONABLE WRONGFUL ACT.

POINT [IX]

THE TRIAL [JUDGE'S] OPINION CONTAINS SO MANY ERRORS THAT IT CANNOT BE RELIED UPON TO SUPPORT THE JUDGMENT.

POINT [X]

LACHES SHOULD HAVE BARRED THE RELIEF GRANTED TO PLAINTIFF.

POINT [XI]

DEFENDANT WAS GREVIOUSLY PREJUDICED BY THE IMPROPER CROSS-EXAMINATION OF . . . FUCETOLA.

We reject defendant's arguments and affirm.

## I.

We first reject defendant's argument that plaintiff lacked standing to institute this action. Although we conclude the issue is not before this court, even if it was, plaintiff has statutory standing as Harry's guardian of the person to seek recovery of property held in constructive trust by defendant.

Rule 2:5-1(e)(3)(i) requires defendant to "designate the judgment, decision, action or rule, or part thereof appealed from" in the notice of appeal. "[W]e review 'only the judgment or orders designated in the notice of appeal.'" Kornbleuth v. Westover, 241 N.J. 289, 298-99 (2020) (quoting 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004)). It is those orders and judgments alone "which are subject to the appeal process and review[.]" 1266 Apartment Corp., 368 N.J. Super. at 459 (citing Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66 (App. Div.), aff'd, o.b., 138 N.J. 41 (1994)); see Park Crest Cleaners, LLC v. A Plus Cleaners and Alterations Corporation, 458 N.J. Super. 465, 472 (App. Div. 2019) (noting that "a party's failure to seek review of cognizable trial court orders or determinations . . . by identifying them in the notice of appeal . . . is largely fatal").

Here, the only order accompanying defendant's notice of appeal is the December 24, 2019 order. Defendant did not include the January 4, 2019 order

denying defendant's motion to dismiss based on standing grounds in the notice of appeal or appendix. While defendant did mention the issue in the CIS as one of the issues being appealed, brief inclusion in the CIS alone is insufficient as a matter of procedure. Cf. Synnex Corp. v. ADT Sec. Servs. Inc., 394 N.J. Super. 577, 588 (App. Div. 2007) (court permitted consideration of an order granting partial summary judgment that was identified as an order being appealed in the CIS where the issue of the validity of the exculpatory clause was also listed as the primary issue on appeal). The issue of standing is therefore not before this court on appeal. We nevertheless add the following remarks about plaintiff's standing as Harry's guardian of the person.

"Standing is not a jurisdictional issue in New Jersey," Capital One, N.A. v. Peck, 455 N.J. Super. 254, 259 (App. Div.), certif. denied, 235 N.J. 469 (2018), but merely "an element of justiciability[.]" Deutsche Bank Nat'l Tr. Co. v. Russo, 429 N.J. Super. 91, 102 (App. Div. 2012) (quoting New Jersey Citizens Action v. Riviera Motel Corp., 296 N.J. Super. 402, 411 (App. Div. 1997)). To have standing to raise an issue, "a party must have 'a sufficient stake and real adverseness with respect to the subject matter of the litigation.'" Triffin v. Somerset Valley Bank, 343 N.J. Super. 73, 81 (App. Div. 2001) (quoting In re Adoption of Baby T., 160 N.J. 332, 340 (1999)). "Standing has been broadly

construed in New Jersey as '[the] courts have considered the threshold for standing to be fairly low.'" Ibid. (quoting Reaves v. Egg Harbor Twp., 277 N.J. Super. 360, 366 (App. Div. 1994)). Although "a litigant may not [ordinarily] claim standing to assert the rights of a third party," Jersey Shore Med. Ctr. v. Estate of Baum, 84 N.J. 137, 144 (1980), "standing to assert the rights of third parties is appropriate if the litigant can show sufficient personal stake and adverseness so that the [c]ourt is not asked to render an advisory opinion." Ibid.

Standing may be statutorily conferred. See, e.g., Triffin v. Bridge View Bank, 330 N.J. Super. 473, 477 (App. Div. 2000). Relevant to this appeal, Rule 4:26-2(a) provides that "a mentally incapacitated person shall be represented in an action by the guardian of either the person or the property . . . or if a conflict of interest exists . . . by a guardian ad litem." Under N.J.S.A. 3B:12-57(f)(10), which governs guardians:

> [A] guardian of the person of a ward shall exercise authority over matters relating to the rights and best interest of the ward's personal needs, only to the extent adjudicated by a court of competent jurisdiction. In taking or forbearing from any action affecting the personal needs of a ward, a guardian shall give due regard to the preferences of the ward, if known to the guardian or otherwise ascertainable upon reasonable inquiry. To the extent that it is consistent with the terms of any order by a court of competent jurisdiction, the guardian shall:

. . . .

> If necessary, institute an action that could be
> maintained by the ward including but not limited to,
> actions alleging fraud, abuse, undue influence and
> exploitation.

N.J.S.A. 3B:12-57(f)(10) clearly identifies undue influence, fraud and related claims that that may be brought by the guardian of the person, therefore conferring standing on plaintiff under these circumstances. Plaintiff believed Harry was the true owner of the Meadows and its income stream notwithstanding how it was legally titled by his attorney. Plaintiff argues that defendant's titling in her own name and the siphoning of the income stream for Harry's support and maintenance was contrary to her role as trustee of Edgar-Charles. This theory is related to undue influence, fraud, and exploitation, with a remedy tied to Harry's financial support.

Whether the property guardian also could have brought the action or may have been more appropriate to bring the action does not alter the fact that the statute clearly confers standing on plaintiff. Defendant does not cite to any case barring the personal guardian's standing, and more importantly she does not cite a case that would have required dismissal of the complaint as opposed to a mere

11

substitution of the guardian.[1]  The property guardian appeared in response to defendant's January 4, 2019 motion to dismiss and could have been substituted as the plaintiff in this action.  Defendant has not identified anything that would have changed if the property guardian had simply substituted in or if defendant had joined her.

## II.

We will not set aside the trial judge's findings of fact "'unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of No. Bergen, 78 N.J. Super 154, 155 (App. Div. 1963)).  We must "give deference to the trial [judge] that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (citing Rova Farms,

---

[1] In a letter to the court, defendant submits that Repko v. Our Lady of Lourdes Medical Ctr, Inc., 464 N.J. Super. 570 (App. Div. 2020), which was published after the parties completed their briefing, undermines plaintiff's argument that defects in standing can be cured through substitution.  We reject the application of Repko here, as there is no defect in standing and conclude that the decision does not warrant this court's dismissal of plaintiff's complaint or otherwise alter the outcome.

A-2234-19T1

65 N.J. at 483-84). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Cumberland Farms, Inc. v. N.J. Dept. of Environmental Protection, 447 N.J. Super. 423, 437 (App. Div. 2016) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)), certif. denied, 229 N.J. 149 (2017). We "give deference to the findings of [the] trial judge because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" In re Civil Commitment of A.Y., 458 N.J. Super. 147, 166 (App. Div. 2019) (quoting In re Civil Commitment of R.F., 217 N.J. 152, 174 (2014)).

"A constructive trust is a remedial device through which the 'conscience of equity' is expressed [and] it will be imposed when a person has acquired possession of or title to property under circumstances which, in good conscience, will not allow the property's retention." Thompson v. City of Atlantic City, 386 N.J. Super. 359, 375-76 (App. Div. 2006) (quoting Flanigan v. Munson, 175 N.J. 597, 608 (2003); Stewart v. Harris Structural Steel Co., Inc., 198 N.J. Super. 255, 266 (App. Div. 1984)), aff'd as modified, 190 N.J. 359 (2007). "The circumstances in which a constructive trust may be imposed are as extensive as required to reach an equitable result." Thompson, 386 N.J. Super. at 376.

13

"[A] constructive trust is a powerful tool to be used only when the equities of a given case clearly warrant it." Flanigan, 175 N.J. at 611. Thus, the party asserting that a constructive trust should be imposed bears the burden of establishing its right to the remedy through clear and convincing evidence. Dessel v. Dessel, 122 N.J. Super. 119, 121 (App. Div. 1972), aff'd o.b., 62 N.J. 141 (1973). Under this standard, the party seeking the remedy "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006) (quoting In re Purrazzella, 134 N.J. 228, 240 (1993)).

"[T]he imposition of a constructive trust requires a two-part finding that the res has been received or retained through a 'wrongful act' which 'unjustly enriches' the recipient." Thompson, 386 N.J. Super. at 376-77 (citing Flanigan, 175 N.J. at 608). A wrongful act is "usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship," D'Ippolito v. Castoro, 51 N.J. 584, 589 (1968) (citing Neiman v. Hurff, 11 N.J. 55, 93 (1952)), and can include "innocent misstatements, or even simple mistakes[.]" Flanigan, 175 N.J. at 609 (quoting Dan B. Dobbs, Remedies, § 4.3 (1973)).

Despite defendant's contentions to the contrary, the judge correctly opined that "the party asserting that a constructive trust should be imposed bears the

14

burden of establishing its right to the remedy with clear and convincing evidence." Applying this standard, the judge found that plaintiff established both elements for imposition of a constructive trust.

First, the judge found the transfer was a wrongful act based on the following specific facts:

> Fucetola less-th[a]n-credibly contradicted himself when questioned about his involvement with the formation of Edgar[-]Charles. Originally, he noted that [Harry] approached him to create this entity. However, he reversed himself at trial when he testified that it was the defendant's idea to establish this business organization.
>
> Fucetola formed the entity uniquely, establishing the entity with two co-trustees, rather than the traditional corporate management structure. According to his trial testimony, the purpose of such a formation was to provide a right of survivorship between [June] and the defendant. However, no trust documents were presented to substantiate this purpose, and such a procedure is not recognized nor supported by statute or regulation.
>
> Fucetola was unable to credibly explain the reason for the transfer from [Harry] to Edgar[-]Charles, and was similarly unable to explain why, if the transfer was bona fide, the defendant would then have had to transfer the properties to herself.
>
> . . . .
>
> The defendant testified that, consistent with her position, that she provided most of the funding for the

purchase of the lots. However, she fails to reconcile this assertion with the fact that the property was not placed in her own name, but rather in a corporate entity.

The source of the funding changed during her testimony. At first, she testified that the funds came from a successful jewelry business, but later, those funds resulted from an inheritance from her sister. No substantiating documentation was provided to support these assertions.

The defendant also noted that she realized funds from the other real estate holdings. However, a review of those deeds reveals that the purchase price reflected only the assumption of existing mortgages rather than any net profits from the sales.

[Defendant] does not provide any plausible explanation about the creation of the business entity being created exclusively and personally from [Harry's] own family.

Despite her position as a trustee, and her self-admitted sophistication in real estate matters, she was unable to explain the import of such a designation, and the fact that despite her position that she owned the properties individually, she, in fact, did and could not because of the ownership under Edgar[-]Charles.

She noted that she received funds from an inheritance from her sister or that she raised these funds from a jewelry business. No specifics were provided to lend credibility with substantiating evidence. Despite her presence and her self-acknowledged business acumen, she did not understand the definition, import, responsibility, and obligation of a trustee's ownership.

The defendant's representation that the defendant was the owner of the premises and had exclusive control

16

over it is belied by the lack of customary evidence to demonstrate that ownership. Specifically, no business checking accounts were presented at trial. Other than her representations, no proof of either the payment or receipt of $10,000.00 per month in rent was credibly established. No business tax returns were presented and accompanied by an unconvincing explanation that the records existed elsewhere and that she was prohibited from access[ing] them.

Rather than reporting her present title as a co-trustee of Edgar[-]Charles, the defendant misrepresented herself as the president of that entity in formal applications and in supporting certifications.

Property taxes were not paid with business checks. Rather, they were paid from a joint account owned by the defendant with [Harry].

Actions taken after [Harry's] stroke cast doubt on the perceived and purported exclusive ownership of the property by the defendant.

Specifically, if the property were vested exclusively with the defendant, and after the "resignation of subscription", there would be no reason, if [Harry] had indeed divested himself of any interest in the properties vis-a-vis Edgar[-]Charles' holdings, to transfer the parcels to herself.

Rent checks for others' use of the premise for parking activities were made directly to [Harry] rather than to the record owner of the premises- Edgar[-]Charles.

The judge further noted that:

Trial testimony supported by documentary evidence revealed that [Harry] participated or orchestrated some

unique property acquisitions and dispositions. Examples include the transfer of property ownership for consideration reflected to be the assumption of a mortgage and properties were transferred to individuals and entities who essentially were employed to hold those assets for other or future purposes. Considering the less-than-consistent testimony provided by . . . Fucetola, the fact that . . . Fucetola had a continuing and on-going representational relationship with [Harry] in a variety of endeavors, and the lack of the defendant's ability to provide specific and credible evidence of her ownership activities of Edgar[-]Charles, it is reasonable to infer that this endeavor was another unique property management technique of [Harry]. Despite the arguments that [Harry] engaged in substantial financial largesse to those within his family and outside of it, the record, and the reasonable circumstantial inferences from those facts does not support the defendant's assertion that it was his intent to divest himself of any equitable ownership of any property. The opposite, however, is both reasonable, supported, and true. Even though [Harry] might have removed himself from the legal title to this property, the plaintiff has established both by direct and circumstantial proof, clearly and convincingly, that he remained in equitable control.

Next, the judge found that defendant was unjustly enriched. The judge

noted that

[e]ach time that a transfer took place, it was related to a watershed moment between the defendant and [Harry]. The first transfer took place following a fight in 2005 in which the defendant divested [Harry] of the equitable rights that he had in a portion of the Meadow's property. Similarly, in 2015, after [Harry] suffered his stroke and after a judicial determination of incapacity, she moved the entirety of the property to her own name.

> In effect, this action impermissibly removed a sizable asset from the reach of [Harry's] financial guardian and unreasonably and prejudicially deprived him of a significant source of funds that would be used for his care.

These findings are supported by substantial credible evidence in the record, and largely based on the judge's findings that the defendant and Fucetola were incredible witnesses, to which this court affords substantial deference. We therefore see no reason to second-guess the trial judge's findings.

Likewise, we see no reason to second-guess the trial judge's factual findings. Specifically, defendant contends that the trial judge failed to distinguish between the lots for purposes of asserting true possession, erroneously found that Fucetola represented Harry in a conflicted interest transaction, failed to appreciate that Harry's sister contributed to the front lots, and the judge should have believed that defendant was a jewelry mogul who inherited money to pay for the properties.

The chronological distinction between the acquisition of the front and rear lots carries no weight, as the question at issue is whether Edgar-Charles and its co-trustees were supposed to do something other than hold legal title to the land. The trial judge did not fail to appreciate Fucetola's exclusive representation of Edgar-Charles. Rather, the question before him was what was Edgar-Charles

A-2234-19T1

and why was title being placed in it. The judge found that the evidence established that Harry retained Fucetola to incorporate Edgar-Charles, and it was incorporated with co-trustees close to Harry. Harry's sister received nothing when she resigned, while Harry continued to operate his businesses for decades, paying himself no rent. Moreover, the judge did not fail to appreciate June's contribution to the front lots. According to defendant's trial testimony, defendant and a business partner paid for the lots. Finally, the judge did not err by not giving weight to defendant's testimony about where her inheritance came from. The judge noted that the story repeatedly changed and the inheritance that somehow paid for the properties in the early 1970s reappeared twice more for the purchase of the front and rear lots. After considering Fucetola's affidavit, the judge properly rejected defendant's explanation of the formation of Edgar-Charles and found her incredible, as she had not produced any evidence of rent payments which would prove a landlord-tenant relationship. These findings are supported by substantial credible evidence in the record

III.

"[T]o maintain a laches defense against a plaintiff's delayed claim, a defendant must assert the defense in a diligent fashion." Mancini v. Twp. of Teaneck, 179 N.J. 425, 433 (2004). "In other words, diligence is a two-way

street." Ibid. "A mere one-time mention of laches in a defendant's answer[, like here,] is insufficient to preserve it through the span of litigation." Ibid.; see Williams v. Bell Tel. Labs. Inc., 132 N.J. 109, 118 (1993) (observing that litigant in that case "had waived the statute-of-limitations defense by its failure to assert that defense at any stage of the proceedings after pleading the statute in its [a]nswer").

Laches "operates to bar a plaintiff from prosecuting all or part of an action based on acts occurring months or years earlier[.]" Mancini, 179 N.J. at 435. "[W]hether laches should be applied depends upon the facts of the particular case and is a matter within the sound discretion of the trial [judge]." Id. at 436 (quoting Garrett v. General Motors Corp., 844 F.2d 559, 562 (8th Cir. 1988)). This court "considers three factors as being especially relevant. They are: (1) whether an alleged act is unreasonably distant in time, (2) whether a plaintiff knew or should have known of a valid claim based on that act, and (3) whether the plaintiff's delay in filing a claim has caused undue prejudice to a defendant." Ibid. (citing National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 121-22 (2002); Shepherd v. Hunterdon Developmental Center, 174 N.J 1, 23 (2002)).

Defendant had opportunities before and after trial to advance a laches defense and failed to do so. Specifically, the trial judge's January 4, 2019 order

called for pre-trial submissions. Defendant only asserted the defense in her answer and argued that it was only "when the judge issued his opinion" that she realized the prejudice caused by the delay. This contention is belied by the record. The record reflects that defendant claimed to be receiving $10,000 per month in base rent from Harry up until his stroke in October 2014. Plaintiff filed this action four years later and defendant had no proof of receiving $120,000 per year from Harry.

Defendant claims that plaintiff caused the delay by bringing the action thirty-five years after the fact. However, placement of legal title thirty-five years ago did not even give rise to the claim. The actions of the co-trustees were not inconsistent with those of Harry until 2014 when he had a stroke and thereafter claimed to be the true owner of the back lots. Plaintiff brought this action four years later in 2018 after she was appointed as Harry's guardian, therefore giving her standing to litigate the issue. With this in mind, and applying the factors set forth in Mancini, the alleged act was not unreasonably distant in time and plaintiff found out four years earlier of the ownership issue in the only way she could have. Additionally, defendant cannot show prejudice where she claims that Harry was her $10,000 per-month tenant up until his stroke, yet failed to proffer tax returns, checks, or bank statements to evidence

decades of payments, even those as recent as 2014. Therefore, even if defendant properly asserted the defense, it would have been meritless. And despite defendant's assertion, there was no reason for the judge to sua sponte apply it.

IV.

Lastly, we reject defendant's argument that the judge erred by allowing plaintiff's counsel to cross-examine defendant's sole attorney witness on disciplinary transgressions.

"'[Trial judges] have a broad discretion in determining the scope of cross-examination.'" Manata v. Pereira, 436 N.J. Super. 330, 343 (App. Div. 2014) (quoting State v. Silva, 131 N.J. 438, 444 (1993)). "[This] court will not interfere with the exercise of such discretion unless clear error and prejudice is shown.'" State v. Adames, 409 N.J. Super. 40, 61 (App. Div. 2009) (quoting Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super 37, 54 (App. Div.), certif. denied, 122 N.J. 391 (1990)).

N.J.R.E. 607 states in relevant part that "for the purposes of attacking or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility[.]" This rule "permits the introduction of extrinsic

evidence affecting a witness's credibility regardless of whether that evidence is relevant to any other issue in the case." State v. Parker, 216 N.J. 408, 418 (2014). The court has held that that when misconduct is an issue in the case, the fact that the attorney was subject to disciplinary proceedings unrelated to the case are admissible to impeach the attorney's credibility. See Fuschetti v. Bierman, 128 N.J. Super. 290, 298 (Law Div. 1974) (noting that for the purpose of attacking credibility it may be shown on cross-examination that a witness is a disbarred attorney).

On cross-examination, the trial judge allowed plaintiff's counsel to confront the attorney with several disciplinary actions by the Office of Attorney Ethics for inadequate record keeping. Plaintiff's counsel offered this line of inquiry to call the attorney's credibility into question, which the trial judge admitted over objection as "relevant under the circumstances." The cause for the witness's ethical violations is relevant here, where there was an alleged conflicted interest transaction. Moreover, inadequate record keeping does bear upon credibility and veracity, especially given Fucetola's involvement with the incorporation of Edgar-Charles and the subsequent title transfers.

Notably, the trial judge's written opinion did not make specific mention of the ethical matters or how they impacted his credibility assessment.

Defendant concedes this, but nonetheless contends that the "[trial judge] was quite clear in finding [the attorney witness] less than credible and stressing the importance of credibility generally in reaching his ultimate conclusion," resulting in an ultimate prejudice to defendant. There was no jury and no impact on the bench trial. As such, we see no prejudice. The cross-examination of Fucetola was therefore appropriate here.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2234-19T1